[No. B215035. Second Dist., Div. One. Dec. 15, 2009.]

BLUE CROSS OF CALIFORNIA, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Morgan, Lewis & Bockius, Richard S. Odom, Kathleen A. Waters, Thomas M. Peterson and Molly Moriarty Lane for Petitioners.

Sheppard Mullin Richter & Hampton, Bryan D. Daly, Peter Morris; Mayer Brown, Donald M. Falk; Manatt, Phelps & Phillips, Gregory N. Pimstone; and Robert E. Bloch for California Physicians' Service, Inc., as Amicus Curiae on behalf of Petitioners.

Amy L. Dobberteen and Michael D. McClelland for State of California, Department of Managed Health Care as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Rockard J. Delgadillo, City Attorney, Jeffrey B. Isaacs, Chief Assistant City Attorney, James W. Colbert III and Anthony M. Miera, Assistant City Attorneys, for Real Party in Interest.

Francisco J. Silva and Long X. Do for California Medical Association and Los Angeles County Medical Association as Amici Curiae on behalf of Real Party in Interest.

Michelman & Robinson, Andrew H. Selesnick and Jason O. Cheuk for American College of Emergency Physicians, State Chapter of California, Inc., as Amicus Curiae on behalf of Real Party in Interest.

**OPINION**

**ROTHSCHILD, J.**—This writ proceeding arises out of a lawsuit filed by the Los Angeles City Attorney against a health insurer, a managed health care service plan, and their parent corporation concerning coverage rescission practices. Defendants demurred to the complaint on multiple grounds, and the

trial court overruled the demurrer. Defendants then filed the instant petition for writ of mandate, seeking reversal of the trial court's ruling on the demurrer. We deny the petition.

The principal issue presented is whether the regulatory and enforcement authority of California's Department of Managed Health Care (DMHC) over managed health care service plans, pursuant to the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, § 1340 et seq.; hereafter the Knox-Keene Act), strips the city attorney of the authority to pursue the unfair competition and false advertising claims alleged in the complaint. We conclude that the DMHC's regulatory and enforcement authority does not preclude the city attorney from pursuing the unfair competition and false advertising claims.

## BACKGROUND[1]

### I. The Complaint

On April 16, 2008, the city attorney filed suit on behalf of the People of the State of California against Wellpoint, Inc., Anthem Blue Cross of California, Inc. (Blue Cross), and Anthem Blue Cross Life and Health Insurance Company (Blue Cross Insurance), alleging claims under both the unfair competition law (Bus. & Prof. Code, § 17200 et seq.; hereafter the UCL) and the false advertising law (*id.*, § 17500 et seq.; hereafter the FAL).[2] Blue Cross is a managed health care service plan subject to the Knox-Keene Act and regulated by the DMHC. Blue Cross Insurance is a life and disability insurer subject to the Insurance Code and regulated by California's Department of Insurance (DOI). Both Blue Cross and Blue Cross Insurance are subsidiaries of Wellpoint.

The city attorney's claims all relate to "postclaims underwriting," a practice prohibited by section 1389.3 of the Health and Safety Code and section 10384 of the Insurance Code: "No health care service plan shall engage in the practice of postclaims underwriting. For purposes of this section, 'postclaims underwriting' means the rescinding, canceling, or limiting of a plan contract due to the plan's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the plan contract. This

---

[1] Because we are reviewing a ruling on a demurrer, we assume the truth of the complaint's properly pleaded factual allegations. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 734 & fn. 2 [68 Cal.Rptr.3d 295, 171 P.3d 20]; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].)

[2] Blue Cross asserts in the petition that it was erroneously sued as "Anthem Blue Cross of California, Inc." and that its actual name is "Blue Cross of California dba Anthem Blue Cross."

section shall not limit a plan's remedies upon a showing of willful misrepresentation." (Health & Saf. Code, § 1389.3; see also Ins. Code, § 10384 [containing an identical prohibition except for substitution of the phrase "policy or certificate" for "plan contract" and elimination of the final sentence, concerning "willful misrepresentation"].) In order to "complete medical underwriting" before issuing coverage, the health plan or insurer must "make reasonable efforts to ensure a potential subscriber's application is accurate and complete." (*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 469 [69 Cal.Rptr.3d 789].)

The complaint alleges that Blue Cross and Blue Cross Insurance have engaged in a practice of violating the statutory prohibition on postclaims underwriting with respect to their individual and family health coverage.[3] According to the complaint, unless an application for health coverage on its face "indicates that the applicant has a medical condition or history that may materially impact the risk of assuming coverage," Blue Cross and Blue Cross Insurance's underwriters do not contact the applicant's doctors or obtain the applicant's medical records before issuing coverage. "[N]o steps of any kind are taken to determine the accuracy of the responses provided in an application that is regular on its face and that does not itself indicate a serious underwriting risk." The complaint alleges that most applications are regular on their face and do not indicate a serious underwriting risk.

After Blue Cross or Blue Cross Insurance issues coverage, however, certain types of claims for benefits will trigger an investigation of the information provided in the application. According to the complaint, defendants have compiled a list of medical diagnoses that appear to be "associated with conditions whose treatment [is] likely to be costly." Whenever defendants receive a claim involving one of those diagnoses, "the claims processing is automatically suspended," and defendants undertake an investigation to try to identify any discrepancies between the claimant's medical records and the information provided by the claimant in the original application for coverage. If they find a discrepancy, they notify the claimant and take additional steps to rescind coverage, "irrespective of whether there is any evidence that [the discrepancies] were the result of intentional misconduct." Even if no discrepancy is found, "the suspension of processing of the claim may have caused a substantial delay in approval of the claim, resulting in postponement of

---

[3] By stating that all of the claims in the city attorney's complaint relate to postclaims underwriting, we do not mean to suggest that the city attorney's only claim under the UCL is for unlawful conduct in violation of the statutes that expressly prohibit postclaims underwriting. On the contrary, the complaint also alleges that defendants have engaged in unfair and fraudulent conduct, as well as conduct that is allegedly unlawful because it allegedly violates legal principles derived from case law or from statutes other than Health and Safety Code section 1389.3 and Insurance Code section 10384.

needed medical care and/or delay in the payment of the patient's doctor, hospital, or other provider."

The complaint further alleges that defendants engage in a number of other acts and practices, all related to their alleged practice of postclaims underwriting, that are unlawful, unfair, or fraudulent within the meaning of the UCL or constitute false advertising within the meaning of the FAL. For example, the complaint alleges that many of the medical history questions on defendants' application forms are "exceedingly and unnecessarily confusing and compound," "call for the [applicant] to make medical judgments," or are otherwise "ambiguous and unintelligible to the average consumer," thereby inducing applicants to provide incorrect or incomplete responses, which defendants can later use to rescind coverage if the applicant develops a medical condition requiring expensive treatment.

In a similar vein, the complaint alleges that the members of defendants' sales force "typically lack the expertise to take an accurate medical history," receive little training in that area, and are paid commissions only on applications that are accepted. "The commission payment structure, combined with the lack of training, works to incentivize agents to downplay to consumers the significance of questions in the application that might produce information that could result in the rejection of the application, or that might jeopardize the sale by causing the consumer to be put in a risk category that carries a higher premium for coverage than the agent had previously quoted. As a consequence, agents frequently 'help' consumers fill out applications so that the consumer will qualify for coverage at the rate quoted."

In addition, the complaint alleges that defendants' advertising and marketing of their individual and family health coverage convey "untrue and misleading information" to consumers. Again, the allegations all relate to postclaims underwriting. For example, the complaint alleges that defendants purport to cover various medical conditions requiring expensive treatment, but defendants fail to disclose that being diagnosed with one of those conditions will trigger an investigation aimed at rescinding coverage. More broadly, defendants do not "disclose their practice of postclaims underwriting and illegal rescission" to applicants for individual and family health coverage, and defendants instead make "untrue and misleading assertions about their integrity and reliability."

Finally, the complaint alleges that defendants issued a press release on February 23, 2008, stating that they "had taken steps in 2006 'to strengthen and make more transparent [their] process for rescinding policies in order to further minimize the possibility of errors.' " The press release listed several specific steps that defendants had purportedly taken in 2006, but the complaint alleges that the claims in the press release were "false or misleading."

For example, one of the measures identified in the press release was "[c]reating a new simplified application for individual benefit policies." The complaint alleges that although defendants did draft a new application form in connection with a tentative settlement of some private litigation relating to postclaims underwriting, the settlement was never finalized and the newly drafted application form "has never actually been used by [d]efendants" for any of their individual and family health coverage.

On the basis of those and related allegations, the complaint alleges claims against all defendants under the UCL and the FAL. The prayer for relief seeks the full range of remedies authorized by those statutes, including (1) injunctive relief prohibiting defendants "from engaging in the unlawful, unfair and/or fraudulent business acts and practices and deceptive advertising" described in the complaint, (2) reinstatement of all health coverage that was wrongfully rescinded as a result of the conduct alleged in the complaint, (3) disgorgement, and (4) civil penalties of $2,500 per violation of the UCL and the FAL.

## II. The Demurrer

Defendants moved to strike certain allegations in the complaint and demurred to the complaint on multiple grounds, only three of which are at issue in this writ proceeding.[4] First, defendants argued that all of the claims against Blue Cross should be dismissed because "the power to regulate, investigate and initiate enforcement actions against [Blue Cross] has been entrusted exclusively to the DMHC" under the Knox-Keene Act. Thus, according to defendants, the city attorney's UCL and FAL claims against Blue Cross are barred by the DMHC's exclusive regulatory and enforcement powers.[5]

Second, defendants argued that the trial court should abstain from deciding the claims in the complaint. Defendants contended that "this case would require the [c]ourt to assume general regulatory powers over the health care industry," but that is "a task . . . better accomplished by the DMHC and DOI, the agencies charged by the Legislature with the necessary enforcement powers to ensure compliance."

---

[4] The cover of the petition for writ of mandate states that it seeks review of the ruling on the motion to strike, and the petition's prayer for relief likewise refers to the ruling on the motion to strike. The memorandum of points and authorities in support of the petition, however, raises no arguments concerning the motion to strike. The city attorney's preliminary opposition to the petition pointed this out, and petitioners did not address the issue in their reply. Accordingly, we will not further discuss the motion to strike.

[5] Defendants raised this argument with respect to Blue Cross alone because it is subject to the Knox-Keene Act and regulated by the DMHC, whereas Blue Cross Insurance is subject to the Insurance Code and is regulated by the DOI.

Third, defendants argued that all of the city attorney's claims should be either dismissed or stayed under the doctrine of primary jurisdiction. According to defendants, all of the relevant considerations weigh in favor of "permitting the DOI and the DMHC to exercise their primary jurisdiction in this case before the [c]ity [a]ttorney should be allowed to pursue his claims, if at all."

The DMHC filed an amicus curiae brief in support of defendants' demurrer. Defendants also sought judicial notice of certain documents relating to regulatory and enforcement actions already undertaken by the DOI and the DMHC, two of which are of particular relevance to this proceeding. Both documents postdate the city attorney's April 16, 2008, lawsuit against defendants.

One document is a report of a survey conducted by the DMHC to assess compliance by Blue Cross and other health care service plans with the statutory prohibition on postclaims underwriting. The survey of Blue Cross included review of 90 case files that were randomly selected from "a log of individual policy rescissions occurring between January 2004 and June 2006." The DMHC concluded that Blue Cross had failed to comply with the statutory prohibition in two respects: First, in 39 of the 90 reviewed cases, Blue Cross "did not conduct a thorough and complete pre-enrollment underwriting investigation prior to approving the application." Second, in the cases in which the preenrollment investigation was inadequate, Blue Cross did not base its decision to rescind coverage on a finding of willful misrepresentation. Indeed, the DMHC "found no evidence" that Blue Cross "considers the intent of the enrollee to commit willful misrepresentation before rescinding coverage." The report was issued to Blue Cross on July 23, 2008, and "issued to the public file" one week later.

The other document is a settlement agreement between Blue Cross and the DMHC that resulted from the DMHC's investigation but actually preceded issuance of the DMHC's report. The effective date of the agreement is July 18, 2008. The agreement states that Blue Cross has made a "voluntary decision" to allow "former enrollees" (defined as persons whose individual or family health coverage was rescinded between Jan. 1, 2004, and July 18, 2008) to purchase individual or family coverage "going forward without medical underwriting." Blue Cross also agreed that it would not rescind any individual or family coverage issued on or before the agreement's effective date, but Blue Cross reserved the right to rescind "in accordance with California law" any individual and family coverage issued thereafter. Elsewhere, the agreement further states that Blue Cross "contends that its actions regarding rescission were [already] in accordance with California law" and that the agreement is not, and shall not be construed as, "any sort of

admission by [Blue Cross] of a violation of, or non-compliance with, [s]ection 1389.3 of the California Health and Safety Code, any other provision of the Knox-Keene Act, or any other federal or state statute, law or regulation, or under common law."

In addition, under the settlement Blue Cross agreed to "undertake reasonable efforts" to "make a written offer to provide a financial settlement" to some (but not necessarily all) of the "former enrollees" to cover their "out-of-pocket medical expenses," which are defined as "those charges or a portion of charges from a medical provider" that Blue Cross would otherwise have paid "but for the rescission." Should disputes about the amounts of the individual financial settlements arise, the agreement provides for alternative dispute resolution. Under the settlement Blue Cross also agreed to pay "an administrative fine" of $10 million and to undertake certain forms of "corrective action" pursuant to a "corrective action proposal" that Blue Cross was to submit to the DMHC.

Finally, the settlement agreement provides broadly that it is a full settlement of all DMHC claims against Blue Cross concerning any rescissions that occurred before the agreement's effective date: "By entering into this [s]ettlement [a]greement, the parties hereby settle all pending enforcement matters and all issues, accusations, and claims that the [DMHC] has *or may have* against [Blue Cross], including, without limitation, any alleged violation of section 1389.3 of the Health and Safety Code *or any other provision* of the [Knox-Keene Act], relating to or arising from any rescission of [individual or family health coverage] that may have occurred on or before July 18, 2008. The [DMHC's] Final Report of the Non-Routine Medical Survey on Post-Claims Underwriting . . . regarding [Blue Cross's] rescission practices *will not be referred to the Division of Enforcement for any further administrative action or otherwise referred for enforcement.*" (Italics added.) The agreement also acknowledges that Blue Cross "is currently involved in private litigation regarding rescission issues," but the agreement provides that "[a]ny settlement agreements arising out of the private litigation shall have no [e]ffect on the terms of this settlement agreement."

On appeal, defendants ask that we judicially notice certain additional documents concerning actions the DOI has taken against Blue Cross Insurance. The documents postdate the trial court's hearing on defendants' demurrer, and the record does not indicate that the documents were ever submitted to the trial court.[6] We nonetheless grant defendants' request that we judicially notice the DOI documents (and we also grant the other requests for judicial notice submitted by the parties and their amici curiae). The documents reflect

---

[6] In the trial court, defendants introduced certain related documents, including a press release describing the DOI's actions.

that on February 6, 2009, the DOI initiated an administrative proceeding against Blue Cross Insurance concerning its health coverage rescission practices. The documents further reflect that on February 9, 2009, the DOI and Blue Cross Insurance entered into a "stipulation and waiver" that settled the dispute. The settlement is broadly similar to the settlement between the DMHC and Blue Cross. It provides, inter alia, that (1) Blue Cross Insurance does not admit any form of wrongdoing; (2) Blue Cross Insurance agrees to stop "knowingly engaging in any acts or practices in the business of life and disability insurance" that violate certain Insurance Code provisions, including the prohibition on postclaims underwriting; (3) Blue Cross Insurance shall make certain funds available to pay certain past medical costs of former insureds whose coverage was rescinded; (4) Blue Cross Insurance will also offer to sell those former insureds health coverage "going forward"; and (5) the settlement "is intended to be a complete and final resolution of the issues and allegations" arising out of the rescission practices that were the subject of the administrative proceeding, and "no further action will be brought against" Blue Cross Insurance by the DOI "upon the matters referenced therein."

### III. The Trial Court's Ruling

On March 3, 2009, the trial court entered a detailed order overruling defendants' demurrer in its entirety. The court rejected all three of the defense arguments described above—the court concluded that (1) the DMHC's regulatory and enforcement powers under the Knox-Keene Act do not preclude the city attorney's UCL and FAL claims, (2) defendants' judicial abstention argument is "not well taken," and (3) defendants "have not established the applicability of the primary jurisdiction doctrine."

At the same time, the court ruled pursuant to Code of Civil Procedure section 166.1 that "there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of [this] litigation." Defendants filed a petition for writ of mandate seeking review of the ruling on the demurrer, and we issued an order to show cause. We also granted the requests of various third parties, including the DMHC, to file amicus curiae briefs. The DMHC contends, as it did in the trial court, that the demurrer should have been sustained.

## DISCUSSION

### I. The City Attorney Has Standing to Bring This Action Under the UCL and the FAL

Defendants argue that the city attorney "has no standing to enforce California's health plan laws" either directly or pursuant to the UCL and the FAL, because "[t]he DMHC's exclusive *regulatory* and *enforcement* authority displaces and subordinates the power of other government prosecutors to regulate health plans or assert that their conduct violates state laws [such as] the Knox-Keene Act."[7] We disagree.

■ The city attorney has express statutory authority to file suit on behalf of the People under the UCL: "Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or a district attorney or by a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, *or by a city attorney of a city having a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor* in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association, or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204, italics added.) The city attorney also has express statutory authority to sue on behalf of the People under the FAL. (Bus. & Prof. Code, § 17535 [granting the city attorney authority to sue under the FAL in terms largely identical to those used in the UCL].) Defendants do not contend to the contrary.

The UCL and the FAL also contain the following provision: "Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state." (Bus. & Prof. Code, §§ 17205, 17534.5.) "Therefore, the fact that there are alternative remedies under a specific statute does not preclude a UCL remedy, unless the statute itself provides that the remedy is to be exclusive." (*State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1303 [32 Cal.Rptr.3d 498, 116 P.3d 1175] (hereafter *Altus*); see also *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 573 [71 Cal.Rptr.2d 731, 950 P.2d 1086] (hereafter *Stop Youth Addiction*).) *Altus* and *Stop Youth Addiction* were UCL cases, but

---

[7] As noted above, this argument relates only to the DMHC (which regulates Blue Cross), not to the DOI (which regulates Blue Cross Insurance). The argument accordingly does not affect the city attorney's claims against Blue Cross Insurance.

because the Legislature used identical language in both the UCL and the FAL to make both statutes' remedies cumulative, there is no reason why the holdings of *Altus* and *Stop Youth Addiction* on this point should not apply to the FAL as well.

■ Existing case law attests to the breadth of the UCL and the cumulative nature of its remedies, both in general and in the specific contexts of the Knox-Keene Act and postclaims underwriting. First, unlawful business practices that are actionable under the UCL "include[] ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730] (hereafter *Farmers*), quoting *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) Second, the UCL authorizes lawsuits to remedy unlawful conduct even if the underlying statute that renders the conduct unlawful does not itself create an independent right of action. (*Stop Youth Addiction, supra*, 17 Cal.4th at pp. 561–567; *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210–211 [197 Cal.Rptr. 783, 673 P.2d 660].) Third, the UCL authorizes duplicate enforcement by both public prosecutors and administrative agencies—a UCL action by law enforcement officials does not preclude a later administrative proceeding against the same defendant concerning the same conduct, and an administrative proceeding does not preclude a later law enforcement action under the UCL. (*People v. Damon* (1996) 51 Cal.App.4th 958, 971–972 [59 Cal.Rptr.2d 504] [same result under both the UCL and the FAL]; *Setliff Bros. Service v. Bureau of Automotive Repair* (1997) 53 Cal.App.4th 1491, 1495 [62 Cal.Rptr.2d 25].) Fourth, even if the underlying statute that renders the conduct unlawful expressly authorizes a particular agency to enforce the statute but does not include a parallel authorization for suits by local law enforcement officials, those officials can still sue under the UCL for violation of the statute. (*People v. McKale* (1979) 25 Cal.3d 626, 632–633 [159 Cal.Rptr. 811, 602 P.2d 731] (hereafter *McKale*).) Fifth, postclaims underwriting, as prohibited by Insurance Code section 10384, is unlawful within the meaning of the UCL and hence is actionable under the UCL. (*Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 542 [72 Cal.Rptr.3d 888] (hereafter *Ticconi*).) Sixth and finally, although the Knox-Keene Act expressly authorizes the DMHC to enforce the statute and does not include a parallel authorization for suits by private individuals, private individuals can bring suit under the UCL for violations of the Knox-Keene Act. (*Bell v. Blue Cross of California* (2005) 131 Cal.App.4th 211, 216–217 [31 Cal.Rptr.3d 688] (hereafter *Bell*).)

As applied in this case, the foregoing authorities point unambiguously to the conclusion that the city attorney has authority to sue under the UCL for violation of Health and Safety Code section 1389.3 (i.e., the Knox-Keene

Act's prohibition of postclaims underwriting) unless there is a statute that expressly precludes the city attorney from doing so. Defendants do not cite any such statute. Indeed, the DMHC effectively concedes in its amicus curiae brief that no such statute exists. ("Concededly, the Knox-Keene Act does not contain a specific statute stating that the Knox-Keene Act and the [DMHC] are the 'exclusive remedy.'")

The DMHC nonetheless contends that the absence of such a statute does not doom defendants' argument, because "[t]he Legislature cannot and need not anticipate every situation that might arise and supply a rule for each situation," and "[t]he Legislature was not required to provide catch phrases to preempt the [city attorney's] actions here." The Legislature did, however, supply a rule for the situation before us—the UCL and the FAL expressly provide that the city attorney may sue for redress under the UCL and the FAL *unless some other statute provides to the contrary.* (Bus. & Prof. Code, §§ 17205, 17534.5; *Altus, supra,* 36 Cal.4th at p. 1303; *Stop Youth Addiction, supra,* 17 Cal.4th at p. 573.) Because no statute provides to the contrary, the city attorney may sue.

In their petition for rehearing, defendants contend that they have indeed cited statutes that "expressly preclude[] the city attorney from suing under the [UCL and FAL] based on violations of the Knox-Keene Act." Defendants first point to Health and Safety Code section 1394, which provides in its entirety as follows: "The civil, criminal, and administrative remedies available to the director pursuant to this article are not exclusive, and may be sought and employed in any combination deemed advisable by the director to enforce the provisions of this chapter."

According to defendants, that statute supports their position for the following reasons: The statute "empowers the DMHC director to select 'any combination' of remedies to be sought," including UCL and FAL claims based on violations of the Knox-Keene Act. By leaving the "combination" of available remedies to the discretion of the DMHC director, defendants conclude, the statute strips other law enforcement officials of their power to bring UCL and FAL claims based on violations of the Knox-Keene Act without the director's prior authorization.

■ Defendants' argument fails because it ignores the requirement that in order for a statute to deprive the city attorney of authority to sue under the UCL or FAL, it must do so *expressly.* (Bus. & Prof. Code, §§ 17205, 17534.5.) On its face, Health and Safety Code section 1394 does not meet that requirement. It authorizes the DMHC director to pursue the remedies "available to the director" "in any combination" that the director "deem[s] advisable." (Health & Saf. Code, § 1394.) But the statute says nothing about

anyone else's authority to pursue those remedies or to pursue any other remedies (i.e., any remedies that are not "available to the director"). Thus, directly contrary to defendants' contention, the statute does not "expressly preclude[] the city attorney from suing under the [UCL and FAL] based on violations of the Knox-Keene Act." (We express no opinion on defendants' contention that the remedies referred to in Health and Safety Code section 1394 include remedies provided by statutes that are not part of the Knox-Keene Act, such as the UCL and FAL.)

■ The other statutes cited in defendants' petition for rehearing fare no better. Health and Safety Code section 1392 authorizes the DMHC director to bring an action for an injunction and any ancillary or other equitable relief, or to ask that the Attorney General do so, but the statute says nothing about the authority of anyone else—whether private citizens or public prosecutors—to pursue such remedies. Health and Safety Code section 1386 authorizes the DMHC director to suspend or revoke the license of a health care service plan if the director determines that the licensee has committed acts or omissions that are grounds for disciplinary action, which include engaging in "any conduct that constitutes fraud or dishonest dealing or unfair competition, as defined by [the UCL]." (Health & Saf. Code, § 1386, subd. (b)(7).) But the statute says nothing about the authority of anyone (including the DMHC director) to bring an action under the UCL or FAL. (Defendants' petition for rehearing also cites Health & Saf. Code, §§ 1387 and 1393.5, but we address those statutes in fn. 9, *post.*)

Lacking the requisite statutory provision to support their argument of exclusivity, defendants instead rely primarily on an overbroad reading of *Van de Kamp v. Gumbiner* (1990) 221 Cal.App.3d 1260 [270 Cal.Rptr. 907] (hereafter *Gumbiner*), a case that did not involve either the UCL or the FAL. In *Gumbiner*, the Attorney General filed suit against a health care service plan and its officers and directors for breach of contract and conspiracy to breach fiduciary obligations. (*Gumbiner, supra,* 221 Cal.App.3d at p. 1265.) The breach of contract claims arose out of the defendants' alleged breaches of the settlement of a previous lawsuit brought by a previous Attorney General. (*Id.* at pp. 1265–1267.) The fiduciary duty claims arose out of the officers' and directors' alleged undervaluing of the plan's assets before converting the plan from a nonprofit to a for-profit corporation. (*Id.* at p. 1267.) The defendants demurred, arguing that the Attorney General "had no authority to maintain the action," and the trial court agreed. (*Id.* at p. 1265.) The Court of Appeal affirmed, reasoning that although the Attorney General had once held certain common law and statutory law enforcement powers concerning health care service plans, those powers had been stripped away by more recent legislative enactments (including the Knox-Keene Act), which had vested

regulatory and enforcement authority in the Department of Corporations.[8] (221 Cal.App.3d at pp. 1269–1282; see also *id.* at p. 1267 ["Department" refers to the Department of Corporations].) The court further reasoned that some of those legislative enactments actually demonstrated legislative intent to supersede the very settlement that the Attorney General was trying to enforce. (*Id.* at pp. 1286–1290.) Moreover, the parties to the settlement were the defendants and the People of the State of California, not the Attorney General personally, and the Attorney General lacked authority to sue on the settlement in the name of the People because the Attorney General had been stripped of his *common law* enforcement powers over health care service plans. (*Id.* at p. 1290.)

*Gumbiner* says nothing at all about the authority of any public official—the Attorney General, a district attorney, or a city attorney—to sue a health care service plan under the UCL or the FAL in connection with an alleged violation of the Knox-Keene Act. Defendants nonetheless contend that *Gumbiner* is controlling here because, for example, it states that the intent of certain legislation "was to ensure that sole regulatory authority [over health care service plans] was vested in the Department [of Corporations]" (*Gumbiner, supra,* 221 Cal.App.3d at p. 1270), and that the effect of another piece of legislation "was to divest the Attorney General of statutory authority to intervene in [certain actions involving health plans] and to vest sole regulatory authority over health plans in the Department [of Corporations]" (*id.* at p. 1281). Because *Gumbiner* thus repeatedly refers to the "sole" authority of the Department of Corporations (which authority has since been transferred to the DMHC), defendants conclude that neither the Attorney General nor any other law enforcement official, such as a district attorney or a city attorney, has authority to enforce the Knox-Keene Act, via the UCL or in any other manner, without prior authorization by the DMHC.

Defendants' argument fails because *Gumbiner*'s references to the "sole" authority of the Department of Corporations do not carry the broad significance that defendants attribute to them. Those references mean only that (1) the Attorney General's Office was stripped of both its common law authority and its authority under certain specified statutes to regulate health plans, and (2) the Knox-Keene Act expressly gave regulatory authority concerning health plans to the Department of Corporations (and later to the DMHC) and did not give it to anyone else. But in the case before us, we are dealing with two statutes, the UCL and the FAL, that do expressly give the city attorney authority to sue as long as no other statute expressly provides to the contrary. *Gumbiner* does not hold or even state in dictum that some other statute provides to the contrary—*Gumbiner* does not involve, and hence says

---

[8] The DMHC was created by statute in 1999 (Health & Saf. Code, § 1341), so it did not exist when *Gumbiner* was decided in 1990.

nothing about, the UCL and the FAL. And, as noted above, by failing to identify any statute that does provide to the contrary, defendants implicitly concede (and the DMHC explicitly concedes) that no such statute exists.

Defendants' attempt to distinguish *McKale* is likewise unavailing. *McKale* involved UCL claims brought by a district attorney to enforce certain provisions of the Mobilehome Parks Act and related sections of the former Administrative Code. (*McKale, supra*, 25 Cal.3d at p. 631.) The Supreme Court stated that "[t]he central issue presented is whether the district attorney has power to proceed against defendants for the claimed violations. While he has no express authority to enforce the Mobilehome Parks Act—such authority being expressly vested in the Commission on Housing and Community Development—he does have standing to sue for acts of unfair competition prescribed by [the UCL, which] expressly empowers a district attorney to prosecute actions for an injunction to halt acts of unfair competition . . . [and] for collection of civil penalties assessed for such acts." (*Ibid.*) The court concluded that the district attorney did have that power, because the UCL expressly gave it to him and no other statute expressly provided to the contrary. (25 Cal.3d at p. 633.) *McKale* is therefore squarely on point: When a statute (the Mobilehome Parks Act or the Knox-Keene Act) grants enforcement authority to a particular government agency (the Commission on Housing and Community Development or the DMHC) and does not grant it to anyone else, a local law enforcement official (a district attorney or a city attorney) can still pursue UCL claims based on conduct made unlawful by the statute.

Defendants' petition attempts to dispose of *McKale* in a single short paragraph, arguing that "*McKale* did not involve a situation where exclusive enforcement authority was vested in a single governmental agency." The argument fails because it assumes that the DMHC's enforcement authority is "exclusive" *in the relevant sense*, but that is precisely the point at issue. No statute says it is, just as in *McKale* no statute said the authority of the Commission on Housing and Community Development was exclusive in the relevant sense.[9] Rather, defendants' sole basis for the claim of exclusivity (apart from *Gumbiner*, which we have already explained is irrelevant) is that the Knox-Keene Act gives enforcement authority to the DMHC and

[9] Defendants cite a provision of the Knox-Keene Act that allows for certain civil penalties that "shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the director [of the DMHC]." (Health & Saf. Code, § 1387, subd. (a); see also *id.*, § 1393.5.) Thus, only the DMHC may seek the civil penalties authorized by that provision of the Knox-Keene Act. The city attorney, however, is seeking civil penalties under the UCL, not under the Knox-Keene Act. The UCL expressly provides that its remedies and penalties are cumulative to the remedies and penalties available under all other California laws unless a statute expressly provides to the contrary. No statute expressly provides that the Knox-Keene Act's and the UCL's civil penalties are mutually exclusive.

does not give it to anyone else, just as in *McKale* the Mobilehome Parks Act gave enforcement authority to the Commission on Housing and Community Development and did not give it to anyone else. We conclude that defendants have failed to distinguish *McKale* and, moreover, that the case is not materially distinguishable.[10]

Defendants' reliance on various other cases is similarly misplaced. For example, defendants cite *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284 [22 Cal.Rptr.2d 20] (hereafter *Samura*), for the proposition that "even private party plaintiffs claiming injury by health plan practices may not bring UCL or other non-Knox-Keene Act claims based on regulatory provisions of the Knox-Keene Act." That case, unlike *Gumbiner*, did involve a UCL action premised on violations of the Knox-Keene Act. (17 Cal.App.4th at pp. 1291–1292.) The Court of Appeal distinguished between provisions of the Knox-Keene Act that are merely regulatory and those that proscribe certain conduct as unlawful. (17 Cal.App.4th at p. 1299.) The court concluded that because the UCL does not confer on private individuals "a general power to enforce" the Knox-Keene Act, private suits under the UCL cannot be used to enforce the act's regulatory provisions. (17 Cal.App.4th at p. 1299.) But the court recognized that a private individual "may still sue [under the UCL] to enjoin acts which are made unlawful by the Knox-Keene Act." (*Ibid.*) The court then reviewed the Knox-Keene Act provisions on which the plaintiff's suit was based, concluded that they were merely regulatory, and therefore concluded that the suit could not proceed. (17 Cal.App.4th at pp. 1300–1302.)

■ *Samura* is of no use to defendants here, because Health and Safety Code section 1389.3 (like Ins. Code, § 10384) both defines the term "post-claims underwriting" and expressly provides that postclaims underwriting is unlawful. Postclaims underwriting is thus an "act[] which [is] made unlawful by the Knox-Keene Act" and hence may be enjoined under the UCL.[11] (*Samura, supra*, 17 Cal.App.4th at p. 1299.)

We are not the first court to reach that conclusion. In *Ticconi*, the defendant health insurer relied on *Samura* in arguing that the Insurance Code provisions dealing with postclaims underwriting "do not provide a basis for a UCL action" because they are merely "regulatory in nature." (*Ticconi, supra*, 160

---

[10] Defendants also attempt to distinguish *McKale* on the ground that in *McKale* the agency "with enforcement authority" had not "actually exercised that authority," as the DMHC has here by investigating and settling with Blue Cross. The attempt fails, because the DMHC's exercise of its authority is irrelevant unless a statute provides that such exercise makes the DMHC's authority exclusive. No such statute exists.

[11] For identical reasons, defendants' reliance on *California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 161 [114 Cal.Rptr.2d 109], which merely reiterates the holdings of *Samura*, is misplaced.

Cal.App.4th at p. 542.) That is, the defendant raised exactly the same argument under *Samura* with respect to Insurance Code section 10384 that defendants in this case raise under *Samura* with respect to Health and Safety Code section 1389.3. The Court of Appeal rejected the argument because Insurance Code section 10384 "explicitly makes postclaims underwriting unlawful and thus provides a basis for an injunction under the UCL." (160 Cal.App.4th at p. 542.) The same conclusion follows concerning Health and Safety Code section 1389.3. By statute, under both the Insurance Code and the Health and Safety Code, postclaims underwriting is an unlawful practice and thus may be enjoined under the UCL.

Defendants also rely on *Altus*, for the proposition that "when a state agency has exclusive jurisdiction over a subject, the authority of other prosecutors is displaced whenever they seek to act concurrently, in a manner that would 'essentially duplicate the [regulating agency's] legal action.' " (Quoting *Altus, supra*, 36 Cal.4th at p. 1307.) Again, the problem with defendants' argument is the lack of statutory support for the claim that the Knox-Keene Act excludes the authority otherwise expressly granted to city attorneys to sue under the UCL to remedy unlawful conduct (such as violations of the Knox-Keene Act). *Altus* involved a statute that expressly vested certain powers " 'exclusively' " in the Insurance Commissioner. (*Altus, supra*, 36 Cal.4th at p. 1304, italics omitted, quoting Ins. Code, § 1037.) Accordingly, the Supreme Court concluded the Attorney General cannot seek remedies under the UCL that would "essentially duplicate" the Insurance Commissioner's exclusive enforcement powers. (36 Cal.4th at p. 1307.) But the Attorney General remained free to pursue UCL remedies that did not duplicate those exclusive enforcement powers. (36 Cal.4th at pp. 1307–1308.)

Defendants cite no statutory provision that expressly vests exclusive enforcement power in the DMHC. *Altus* therefore supports the city attorney, not defendants. The city attorney's UCL and FAL claims do not duplicate any enforcement powers that a statute expressly makes the exclusive province of the DMHC.

██ Defendants also argue that we should show deference to the DMHC's view that the city attorney lacks standing to pursue this action against Blue Cross. We disagree. Although "[t]he construction of a statute by the executive department charged with its administration is entitled to great weight and substantial deference" (*Bell, supra*, 131 Cal.App.4th at p. 217, fn. 8), we cannot agree with the DMHC's ultimate conclusion that the city attorney lacks standing. ██ Both the UCL and the FAL (which the DMHC does *not* administer) expressly authorize the city attorney's claims and expressly provide that both statutes' remedies and penalties are cumulative to those available under all other California laws unless a statute expressly provides to

the contrary. The DMHC concedes that the Knox-Keene Act (which the DMHC *does* administer) does not expressly provide to the contrary. We therefore do not defer to the DMHC's view that the Knox-Keene Act divests the city attorney of authority to pursue the UCL and FAL claims alleged in the complaint.

Finally, both defendants and the DMHC advance various public policy arguments aimed at showing that the city attorney's suit constitutes pernicious "dual regulation" of health plans and will have an adverse effect on California's fragile health care "ecosystem." Such arguments are properly addressed to the Legislature, not to this court. The statutory language is unambiguous—the UCL and the FAL expressly give the city attorney authority to sue unless otherwise provided to the contrary, and, as relevant here, no other statute does provide to the contrary.

Further, defendants' and the DMHC's public policy arguments are not persuasive. Defendants and the DMHC concede, as they must, that private plaintiffs can pursue UCL actions based on violations of the Knox-Keene Act. (*Bell, supra,* 131 Cal.App.4th at p. 215.) Defendants' and the DMHC's position therefore is not that *no one* can bring a UCL action that would "duplicate" the DMHC's power to enforce the Knox-Keene Act. Rather, defendants and the DMHC contend that local law enforcement officials cannot bring such actions, even though private plaintiffs undisputedly can. But defendants and the DMHC never explain why, at the level of public policy, UCL actions based on violations of the Knox-Keene Act will allegedly lead to more undesirable consequences when brought by local law enforcement officials than when brought by private plaintiffs. In the absence of such an explanation, it is difficult to discern any public policy rationale for prohibiting the city attorney's suit.

For all of the foregoing reasons, we conclude that the city attorney has standing to pursue the complaint's UCL and FAL claims against Blue Cross.

## II. The Trial Court Did Not Abuse Its Discretion by Declining to Abstain

Defendants argue that "[t]he trial court should have abstained as to *all* the claims in this case." We review the trial court's decision for abuse of discretion. (*Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1297 [64 Cal.Rptr.3d 250] (hereafter *Alvarado*).) We conclude that the trial court's decision not to abstain did not exceed the bounds of reason, so the court did not abuse its discretion.

"[A] reviewing court should not disturb the exercise of a trial court's discretion unless it appears that there has been a miscarriage of justice. . . . 'It is fairly deducible from the cases that one of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193], citation omitted, quoting *Loomis v. Loomis* (1960) 181 Cal.App.2d 345, 348–349 [5 Cal.Rptr. 550].)

 Case law states that a court may abstain from adjudicating a suit that seeks equitable remedies if "granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency." (*Alvarado, supra,* 153 Cal.App.4th at p. 1298.) Abstention may also be appropriate if "the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency," or if "granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress."[12] (153 Cal.App.4th at p. 1298.)

The trial court could have reasonably concluded that none of those circumstances is present in the city attorney's action. First, the city attorney is not asking the court to assume or interfere with the functions of an administrative agency. Rather, the city attorney is asking the court to perform an ordinary judicial function, namely, to grant relief under the UCL and the FAL for business practices that are made unlawful by statute. The relief requested by the city attorney will not interfere with the functions of either the DOI or the DMHC, including the relief that those agencies have already secured by settlements. If the city attorney prevails on the complaint in its entirety and the trial court awards all of the relief sought, then that relief will in no way hinder Blue Cross, Blue Cross Insurance, the DMHC, or the DOI from performing all of their obligations under their respective settlement agreements. There is thus no conflict and no interference. Indeed, the DMHC expressly agreed in its settlement with Blue Cross that any possible future settlement of pending private litigation concerning coverage rescissions "shall have no [e]ffect on the terms of" the DMHC settlement. If the settlement of that private litigation, on whatever terms the parties might agree to, will have

---

[12] In addition, courts may abstain when federal enforcement of the subject law would be preferable in certain respects (*Alvarado, supra,* 153 Cal.App.4th at p. 1298), but defendants do not contend that is the case here.

*no effect* on the DMHC settlement, then we cannot see how the city attorney's suit could amount to interference warranting abstention.

Second, the city attorney's suit does not call upon the court to determine complex economic policy. The Legislature has already made the relevant policy determinations by defining and outlawing postclaims underwriting. The court is, in the main, merely being called upon to enforce those statutory prohibitions.[13]

Third, the city attorney is not seeking injunctive relief that would be unnecessarily burdensome for the court to monitor or enforce. There is no indication in the city attorney's complaint that it is asking for the court to monitor anyone or anything. The city attorney is asking for an injunction. If the trial court issues an injunction, then defendants will be expected to comply with it, but that does not impose on the court any active role in monitoring compliance. (See *Ticconi, supra,* 160 Cal.App.4th at p. 547 [rejecting an identical argument on the ground that the plaintiff sought "an injunction to stop Blue Shield Life's" allegedly unlawful rescission practices but did not seek "continuing court supervision"].)

Accordingly, the trial court did not exceed the bounds of reason when it rejected defendants' arguments that (1) the city attorney's action "seeks equitable relief that would, if granted, interfere with the functions of the administrative agencies" charged with regulating Blue Cross and Blue Cross Insurance, (2) the city attorney "seeks relief in conflict with what the regulating agencies have directed," and (3) "the equitable relief sought by the [c]ity [a]ttorney could be burdensome for the courts to enforce and monitor."

Moreover, all of those arguments relate only to the injunctive relief sought in the complaint, but the complaint does not seek *only* injunctive relief. Rather, it also seeks restitution and civil penalties. Consequently, defendants' arguments cannot show that the trial court should have abstained from adjudicating the complaint in toto, because those arguments concern only one of the several remedies that the city attorney seeks. For that reason as well, defendants' arguments cannot show that the trial court's decision exceeded the bounds of reason.

For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion by declining to abstain.

---

[13] As described *ante,* the complaint does seek to remedy certain practices that do not in themselves constitute postclaims underwriting, such as defendants' use of allegedly flawed application forms. But as also described *ante,* the alleged flaws in the application forms all relate to postclaims underwriting—the city attorney's argument is that the flaws in the application forms tend to induce applicants to provide inaccurate or incomplete responses, which defendants can then use as grounds to rescind coverage when defendants engage in postclaims underwriting.

### III. The Trial Court Did Not Abuse Its Discretion by Declining to Apply the Primary Jurisdiction Doctrine

Defendants argue that the trial court should have applied the doctrine of primary jurisdiction and stayed or dismissed the city attorney's suit pending the outcome of further administrative proceedings. We review the trial court's ruling on the primary jurisdiction issue for abuse of discretion. (*Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917, 935 [16 Cal.Rptr.3d 849, 94 P.3d 1055] (hereafter *Neil*); *Farmers, supra*, 2 Cal.4th at pp. 391–392.) We conclude that the trial court did not abuse its discretion.

The doctrine of primary jurisdiction " 'comes into play whenever enforcement of the [plaintiff's] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers, supra*, 2 Cal.4th at p. 390.) The doctrine thus applies " 'to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a "referral" to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling.' " (*Wise v. Pacific Gas & Electric Co.* (2005) 132 Cal.App.4th 725, 740 [34 Cal.Rptr.3d 222], quoting *Reiter v. Cooper* (1993) 507 U.S. 258, 268–269 [122 L.Ed.2d 604, 113 S.Ct. 1213].) Also, like the closely related doctrine of exhaustion of administrative remedies, the doctrine of primary jurisdiction is subject to a futility exception: "[I]t is improper to invoke the primary jurisdiction of an administrative agency if it is clear that further proceedings within that agency would be futile." (*Neil, supra*, 33 Cal.4th at p. 936.)

We conclude that defendants' primary jurisdiction argument fails at the threshold because defendants do not identify any issues that the trial court ought to refer to the DOI or the DMHC for determination. In the preliminary opposition to the petition, the city attorney pointed out that gap in defendants' argument. In their subsequent briefing, however, defendants still did not identify a single issue that the court ought to refer for agency determination. The essence of the primary jurisdiction doctrine is this: If litigation presents issues that are not " 'within the conventional competence of the courts' " and " 'the judgment of a technically expert body' " would aid judicial decision-making, then the court may refer those issues to that body. (*Farmers, supra*, 2 Cal.4th at p. 390, quoting *Nader v. Allegheny Airlines* (1976) 426 U.S. 290, 305–306 [48 L.Ed.2d 643, 96 S.Ct. 1978].) By failing to say which issues the trial court purportedly should have referred to the DOI and DMHC, defendants have made it impossible for us to conclude that the trial court abused its discretion by failing to order such a referral.

## DISPOSITION

The petition is denied. Real party in interest shall recover its costs of this writ proceeding.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied January 12, 2010, and the opinion was modified to read as printed above. Petitioners' petition for review by the Supreme Court was denied March 30, 2010, S179753.