Filed 6/1/15; pub. order 6/26/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| COREY HAMBRICK,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HEALTHCARE PARTNERS MEDICAL GROUP, INC. et al.,<br><br>    Defendants and Respondents. | B251643<br><br>(Los Angeles County<br>Super. Ct. No. BC492767) |

————————————

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Highberger, Judge.  Affirmed.

McMurray Henriks, Yana G. Henriks and Randy H. McMurray for Plaintiff and Appellant.

McDermott Will & Emery, Terese A. Mosher Beluris and Gregory R. Jones for Defendants and Respondents.

————————————

# INTRODUCTION

Plaintiff Corey Hambrick (Hambrick) brought this class action alleging causes of action for violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.), common law fraudulent concealment, and violation of the false advertising law (FAL; *id.*, § 17500) against defendants Healthcare Partners Medical Group, Inc. (MGI), Healthcare Partners, LLC (HCP-LLC) and DaVita Healthcare Partners, Inc. (DVHCP) (collectively HCP or the HCP defendants).[1]  The premise underlying all of Hambrick's claims is that although HCP does not fall within the literal definition of a "health care service plan"[2] as defined in Health and Safety Code section 1345, subdivision (f)(1),[3] due to the level of risk it assumed, HCP operated as a health care service plan without obtaining the license required by the Knox-Keene Health Care Service Plan Act of 1975[4] (Knox-Keene Act; § 1340 et seq.), and without meeting the regulatory mandates required of health care service plans.

---

[1]     The complaint refers to "Health Care Partners Medical Group, Inc." as HCP and elsewhere refers to all three defendants collectively as HCP.  For example, the complaint alleges in different sections that MGI or HCP operated without a license and assumed the financial risk of hospital and specialty care.  For simplicity, we will refer to HCP as the entity required to have a license and the entity that assumed the financial risk.  Where we can tell that an allegation is directed only at MGI, for example, referring to Hambrick's employer and medical group network of doctors, we will refer only to MGI.

[2]     Health care service plans are commonly referred to as health maintenance organizations or HMOs.  (*PacifiCare of California v. Bright Medical Associates, Inc.* (2011) 198 Cal.App.4th 1451, 1456, fn. 2; *Watanabe v. California Physicians' Service* (2008) 169 Cal.App.4th 56, 59, fn. 3.)  We will use the statutory term "health care service plan" and the shortened term "health plan" interchangeably in this opinion.

[3]     All further statutory references are to the Health and Safety Code, unless otherwise indicated.

[4]     The Knox-Keene Act was amended in 2002.  Citations in this opinion are to the amended Act.

2

The trial court, relying on the doctrine of judicial abstention, sustained without leave to amend the demurrers filed by the HCP defendants and entered a judgment of dismissal. Hambrick appeals from the judgment, which includes an order awarding the HCP defendants costs.

Hambrick argues on appeal that HCP was required to have a license under the Knox-Keene Act because it accepted a level of "global risk" that transforms it from a medical "risk-bearing organization" under section 1375.4 to a "health care service plan" under section 1345. However, neither the Knox-Keene Act nor the regulations adopted by the Department of Managed Health Care (DMHC) defines the level of risk that would cause a medical entity like HCP to become a de facto health care service plan. We find that this determination of an acceptable risk level is a regulatory decision involving complex economic policy considerations that should be made by DMHC, the regulatory agency tasked with interpreting and enforcing the Knox-Keene Act.

We therefore conclude that the trial court acted within its discretion in invoking the abstention doctrine as to the statutory causes of action but not as to the common law cause of action for fraudulent concealment. However, we find that Hambrick failed to plead a claim for fraudulent concealment, and that she has failed to demonstrate how she could amend the operative complaint to cure the defect. We affirm the judgment of dismissal, including the order awarding costs.

3

## FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. *The First Amended Complaint*

On January 25, 2013 Hambrick, on behalf of herself and others similarly situated, filed a first amended class action complaint for damages and equitable relief against the HCP defendants.[6]  Hambrick alleges that MGI is a professional medical corporation and HCP-LLC is a wholly owned subsidiary or affiliate of DVHCP, a Delaware corporation. MGI and HCP-LLC "operated in such a way as to make their individual identities indistinguishable, and are therefore the mere alter egos of one another."

As alleged, HCP operated as a health care service plan for nearly a decade without obtaining the license required by the Knox-Keene Act.  Hambrick paid her medical premiums to a health care service plan other than HCP.  However, HCP assumed the financial risk and responsibility for Hambrick's "institutional care" (hospital care)[7] and other health care services (e.g., physicians), and it paid for her care through contracts with health care service plans and other third parties.  By assuming the financial risk for

---

[5] Because this appeal challenges the trial court's order sustaining a demurrer, we assume the truth of all facts properly pleaded in the first amended complaint, as well as reasonable inferences derived from those facts.  (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1100; *Van Horn v. Department of Toxic Substances Control* (2014) 231 Cal.App.4th 1287, 1292.)  We do not, however, "'assume the truth of  contentions, deductions or conclusions of fact or law.'"  (*Loeffler*, *supra*, at p. 1100; *Rosolowski v. Guthy-Renker LLC* (2014) 230 Cal.App.4th 1403, 1410.)

[6] The first amended complaint names Juan Carlos Jandres (Jandres) as a plaintiff. Jandres has not appealed from the adverse judgment and thus is not a party to this appeal. We therefore omit the factual allegations pertaining to Jandres.  While Hambrick also brings this action on behalf of similarly situated plaintiffs, in this opinion we will only address Hambrick's claims.

[7] Section 127575, subdivision (e), defines "'[i]nstitutional provider services'" as "services, equipment, and supplies . . . provided by an institution, site, or facility through which [medical] services are provided."  Because the definition excludes "'professional health care services,'" hospital care is typically referred to in the Knox-Keene context as "institutional care."

4

Hambrick's hospital care without a license, HCP purported to relieve Hambrick's health care service plan, which is legally responsible for her care, of any financial responsibility for her care.

HCP directed Hambrick's hospital care, limiting her access to hospital care to only those hospitals with which HCP contracted, and prohibiting her from accessing "better" hospitals that contracted with her health care service plan. In addition, HCP directed Hambrick's specialty care "to physicians who practice at the hospitals with which HCP contracts" and "away from better physicians who practice at hospitals with which HCP does not contract in order to avoid paying for high quality care." Hambrick alleges that she was entitled to use the better hospitals and physicians who contracted with the health care service plan to which she paid her premiums.

Hambrick further alleges that HCP purposefully limited her access to care for the purpose of maximizing profits as a result of its "assumption of institutional financial risk without the required State license." By doing this, HCP "avoided a near decade of regulatory scrutiny of its operations, avoided paying the regulatory fees assessed by DMHC to all licensees, and avoided the numerous specific, consumer-protection mandates in the Knox-Keene Act such as the requirement to provide timely access to medically necessary care." In addition, HCP "reaped extraordinary profits in the billions of dollars by delaying and denying access to medically necessary care to its members."

Up until October 2012, Hambrick was an employee of MGI, and she was a patient of MGI from 2011 to 2012. While employed by MGI, Hambrick acquired personal knowledge that HCP "was paying claims for institutional/hospital care for claims for which HCP had assumed the responsibility for payment." MGI's physicians served as Hambrick's primary care physicians (PCPs). She alleges that her "assigned PCPs failed to adequately diagnose or treat the source of [her] injury."[8] She was referred to at least two specialists with HCP's "network of contracted or employed staff physicians," each of whom "failed to accurately diagnose or treat [her] injuries."

---

[8] Hambrick did not specify the nature of her injury in the operative complaint.

5

In January, March and July 2012, Hambrick complained to MGI "that she was receiving inferior care from her assigned physicians, and protested both the quality of her care and the delays in accessing primary and specialist care." Hambrick alleges that HCP "delayed her access to care because [HCP] had assumed risk for hospital charges, even though they did not have the required State license that would allow them to assume the risk for such institutional care." In addition, she alleges "that the desire to avoid a hospital claim affected the decisions made by HCP which restricted HAMBRICK'S access to high quality specialists who practiced at hospitals with whom HCP did not contract."

Hambrick alleges further that HCP's "desire to avoid paying hospital claims it had agreed to become responsible for, caused HCP to deny HAMBRICK[] access to qualified specialists and physicians who could accurately diagnose and treat her, because those physicians might admit HAMBRICK to HCP's non-preferred hospitals. HAMBRICK ultimately was forced to purchase her own insurance and to seek care outside of [MGI] in order to timely access care."

Hambrick defines the purported class as "[a]ll patients for whom HCP assumed financial responsibility for the institutional care of, or directed the institutional care of" and "[a]ll HCP patients treated by HCP while HCP is or was controlled or owned by non-physician shareholders."

In the first cause of action for violation of the UCL, Hambrick alleges that HCP violated numerous statutory provisions, including those in the Knox-Keene Act, and that HCP's actions constituted fraudulent and unfair business practices under the UCL. Hambrick alleges that HCP profited by ignoring the requirements of California law, including the requirements for financial reserves applicable to health care service plans. Hambrick also alleges that HCP profited by denying access to care and providing inferior care. Hambrick seeks disgorgement of "ill-gotten gains" and "an injunction prohibiting [HCP] from violating California law."

The second cause of action for fraud and "concealment" alleges that "Plaintiffs and [the HCP defendants] were in a relationship of trust," and that the HCP defendants

6

had a duty "to disclose to their patients all material information a reasonable patient would want to know before consenting to treatment." The HCP defendants concealed that they had illegally assumed financial responsibility for hospital care and that this would affect the physicians and hospitals to which HCP would direct plaintiffs. HCP further concealed that it was not licensed as a health care service plan or hospital, "and therefore was not lawfully permitted to accept hospital risk or direct hospital care, and that Plaintiffs would not be afforded all the protections afforded to consumers by a Knox-Keene licensed entity."

The complaint further alleges that plaintiffs "reasonably relied upon [the HCP defendants] to seek their fully informed consent, and to treat them consistent with good professional practice and medical standards." Hambrick alleges that she was injured because she received deficient care from the physicians and hospitals to which she was referred instead of the physicians and hospitals that contracted with the health care service plans to which she paid her premiums. She alleges as damages "physical injuries, emotional injuries, loss of income, future medical expenses, [and] co-pays or co-insurance payments to the hospitals." Hambrick also seeks punitive damages against HCP pursuant to Civil Code section 3294.

Hambrick's third cause of action is for violation of the FAL. She alleges that the HCP defendants "advertise, including through their website www.healthcarepartners.com, that they are committed to the guiding principle of coordinated care," that the services provided by HCP "are 'patient centered,'" and that HCP "will always strive for the highest quality outcomes." HCP concealed its unlicensed status, the financial arrangements by which it was obligated to pay for Hambrick's care, and the fact that "Plaintiffs would not be afforded the other consumer protections provided by the Knox-Keene Act."

Contrary to its representations, HCP "did not provide to Plaintiffs coordinated care intended to achieve the highest quality outcomes. Instead, [the HCP defendants] managed their patients' and Plaintiffs' care in a manner designed to delay or deny physician, specialist and hospital care necessary to properly diagnose and treat Plaintiffs'

7

conditions."  The HCP defendants' advertisement and representations were made with knowledge that they "had assumed full financial risk without a Knox-Keene license and without the financial reserves required of licensed health plans."  Hambrick alleges that HCP made the representations with the intent to induce patients and health plan members to use HCP for their services, and that HCP knew it was misleading them.  Hambrick alleges as damages the premiums paid to HCP, co-pays, deductibles, and co-insurance payments paid to HCP.

In her third cause of action, Hambrick seeks to "disgorge [the HCP defendants] of all unjust gains," including "all capitation[9] paid to [the HCP defendants], and all co-pays, deductibles and co-insurance payments paid to [the HCP defendants]" and for injunctive relief, including to "enjoin [the HCP defendants] from their misleading advertising."

## B. *Demurrers*

On March 20, 2013 MGI filed a demurrer to the first amended complaint and a motion to strike.  MGI also sought a protective order staying discovery.  MGI demurred on the grounds that Hambrick failed to state facts sufficient to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) and that the court lacked jurisdiction (*id*., § 430.10, subd. (a)).  In its points and authorities, MGI argued that the doctrine of judicial abstention required dismissal of all claims or, in the alternative, the court should invoke the doctrine of primary jurisdiction to allow the DMHC to make a licensing decision.

---

9       The term "'capitation' basis . . . means the [health plan's] reimbursement rate is calculated on a per capita basis, with a flat rate paid for each individual enrolled in the plan during a particular time period."  (*Solorzano v. Superior Court* (1992) 10 Cal.App.4th 1135, 1141; see also Cal. Code Regs., tit. 28, § 1300.76, subd. (f) ["'capitated basis' means fixed per member per month payment or percentage of premium payment wherein the provider assumes the full risk for the cost of contracted services without regard to the type, value or frequency of services provided"].)

8

MGI also argued that each cause of action failed to state a claim. MGI challenged the fraudulent concealment cause of action on the ground Hambrick failed to plead a duty to disclose, justifiable reliance, causation and recoverable damages. Finally, MGI argued that plaintiffs lacked standing to bring a cause of action for false advertising on the basis that they had not alleged that they saw MGI's advertising or relied on it in selecting MGI's physicians.

On April 12, 2013 HCP-LLP and DVHCP filed a separate demurrer raising the same issues raised by MGI in its demurrer. In their demurrer, HCP-LLP and DVHCP also argued that the claims against them should be dismissed because Hambrick failed adequately to plead any alleged wrongdoing or secondary liability on their part. HCP-LLP and DVHCP also sought a protective order.

Hambrick opposed both demurrers, as well as MGI's motion to strike. In her opposition to the demurrers, Hambrick acknowledged that "not . . . all capitated medical groups accepting professional risk are health plans," but argued that HCP's "direct or indirect acceptance of hospital capitation constitutes unlicensed health plan operation" and is a "*per se* violation of the Knox-Keene Act."

## C. *Trial Court's Ruling*

On June 21, 2013 the trial court sustained MGI's demurrer without leave to amend as to all three causes of action, adopting in its entirety its previously issued tentative decision. Addressing MGI's request that it invoke the doctrine of judicial abstention, the trial court observed:

"Consumer cases involving challenges to the conduct of health care plans, health care insurers and health care providers, commonly brought as class action claims under [the UCL], have presented the judicial abstention issue in many different factual contexts. The trial court rulings and appellate rulings thereon do not present a tidy pattern with an easily ascertainable test for when judicial abstention should or should not be applied. This, in its own way, would appear to demonstrate why there are a range of reasonable rulings which can be made in a given factual and legal context to either abstain or not

9

abstain according to the trial court's best evaluation of (a) the complexity of the issue(s) presented, (b) its/their overlap with issues committed to the primary jurisdiction of the regulatory authority and (c) the possibility that inconsistent directions will be given to the regulated entity if the [c]ourt acts in tandem with the authorized regulator's continuing exercise of its power to direct specific conduct.

"The class action case here is pled under Business [and] Professions Code [sections] 17200 and 17500 and as a common law claim for fraud, but common-law fraud claims, as such, hardly ever qualify for class treatment. The real nub of the case, therefore, is the equitable UCL claim and [FAL] claim pled on behalf of a putative class. The [c]ourt finds in the exercise of its discretion after reviewing the argument of all parties that this is a suitable case for the application of judicial abstention. Each cause of action requires the [c]ourt to decide whether or not [MGI] is a health plan that was required to have been licensed under the [Knox-Keene Act]. To determine whether or not [MGI] is or is not in compliance with health maintenance organization licensing laws requires a detailed analysis of complex corporate structures, of risk allocation via service provider 'cap[it]ation' contracts of the cost of providing medical care, and many related factual and legal issues."

After a consideration of applicable case law and authorities cited by plaintiffs, the trial court was "not persuaded that it should allow this case to proceed in this forum." It therefore sustained MGI's demurrer without leave to amend. The court did not reach MGI's argument that plaintiffs failed to state facts sufficient to state their causes of action.

As to the demurrer filed by HCP-LLP and DVHCP, the trial court noted that "[e]ach of the three causes of action as against each of these two co-defendants . . . would require the [c]ourt to deal with the same licensing issue presented by the direct claim of plaintiffs against [MGI]. Thus for the same reasons that abstention will be applied as to the claims against [MGI], the [c]ourt determines that it is prudent to abstain as to the interrelated claims against these two parties."

10

In light of its ruling on the demurrers, the trial court declared MGI's motion to strike, as well as the motions for a protective order staying discovery, to be moot.

On July 19, 2013 the trial court entered judgment in favor of the HCP defendants, awarded them costs, and dismissed the action with prejudice. Thereafter, the HCP defendants filed a memorandum of costs. Hambrick moved to tax costs, arguing that the HCP defendants were not prevailing parties in light of the trial court's decision to abstain and that the HCP defendants failed to itemize their costs. The HCP defendants then filed a restated memorandum of costs. The trial court denied the motion to tax costs.

This timely appeal by Hambrick from the judgment of dismissal, including its award of costs, followed.

## DISCUSSION

### A. *Overview of the Knox-Keene Act*

1. Provisions of the Act

The Knox-Keene Act "provides the legal framework for the regulation of California's individual and group health care [service] plans" by the DMHC. (*Rea v. Blue Shield of California* (2014) 226 Cal.App.4th 1209, 1215.) The Legislature's "intent and purpose" in enacting the Knox-Keene Act was "to promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a health care service plan or specialized health care service plan . . . ." (§ 1342.)

The DMHC "has charge of the execution of the laws of this state relating to health care service plans and the health care service plan business including, but not limited to, those laws directing the department to ensure that health care service plans provide enrollees with access to quality health care services and protect and promote the interests of enrollees." (§ 1341, subd. (a).) The chief officer of the DMHC is the director of the DMHC. (*Id.*, subd. (b).) "The director shall be responsible for the performance of all

11

duties, the exercise of all powers and jurisdiction, and the assumption and discharge of all responsibilities vested by law in the department. . . ." (*Id.*, subd. (c).)

The Knox-Keene Act defines a "'[h]ealth care service plan'" as "[a]ny person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f)(1).) The term "'[p]erson'" includes a medical corporation or association.[10] (*Id.*, subd. (j).) "'Basic health care services'" encompass "[p]hysician services, including consultation and referral," "[h]ospital inpatient services and ambulatory care services," "[d]iagnostic laboratory and diagnostic and therapeutic radiologic services," "[h]ome health services," "[p]reventative health services," "[e]mergency health care services," and "[h]ospice care." (*Id.*, subd. (b)(1)-(7).)

Health care service plans must be licensed by the DMHC in order to operate in California. (§ 1349; *Viola v. Department of Managed Health Care* (2005) 133 Cal.App.4th 299, 309; *Imbler v. PacifiCare of Cal., Inc.* (2002) 103 Cal.App.4th 567, 570.) Section 1349 provides: "It is unlawful for any person to engage in business as a plan in this state or to receive advance or periodic consideration in connection with a plan from or on behalf of persons in this state unless such person has first secured from the director a license . . . ," or the person is exempt from regulation.[11]

---

[10] Section 1345 defines a "'[p]erson'" to include "any person, individual, firm, association, organization, partnership, business trust, foundation, labor organization, corporation, limited liability company, public agency, or political subdivision of the state." (*Id.*, subd. (j).)

[11] In order to obtain a license to operate as a health care service plan, an organization must submit an application in conformity with lengthy requirements of section 1351 and California Code of Regulations, title 28, section 1300.51. Section 1353 provides that "[t]he director shall issue a license to any person filing an application pursuant to this article, if the director, upon due consideration of the application and of the information obtained in any investigation, including, if necessary, an onsite inspection, determines that the applicant has satisfied the provisions of this chapter and that, in the judgment of

12

A licensed health care service plan may contract with a "risk-bearing organization" for the provision of health care services. (§ 1375.4; Cal. Code Regs., tit. 28, § 1300.75.4 et seq.) A risk-bearing organization includes "a professional medical corporation, other form of corporation controlled by physicians and surgeons, a medical partnership, . . . or another lawfully organized group of physicians that delivers, furnishes, or otherwise arranges for or provides health care services," other than a health care service plan, "that does all of the following: [¶] (A) Contracts directly with a health care service plan or arranges for health care services for the health care service plan's enrollees. [¶] (B) Receives compensation for those services on any capitated or fixed periodic payment basis. [¶] . . . [¶] (C) Is responsible for the processing and payment of claims made by providers for services rendered by those providers on behalf of a health care service plan that are covered under the capitation or fixed periodic payment made by the plan to the risk-bearing organization. . . ." (§ 1375.4, subd. (g).)[12]

The central issue in this case is whether HCP is a health care service plan under section 1345, subdivision (f)(1), or a risk-bearing organization under section 1375.4, subdivision (g). Only the former requires a Knox-Keene license. As we discuss below, the question of the proper characterization of HCP can only be determined by making a policy determination as to the acceptable level of risk a medical group may accept before being required to obtain a license as a health care service plan.

_____

the director, a disciplinary action pursuant to Section 1386 would not be warranted against such applicant. Otherwise, the director shall deny the application."

[12] Section 1300.75.4, subdivision (d)(2), of title 28 of the California Code of Regulations defines a "[r]isk-shifting arrangement" as "a contractual arrangement between an organization and a plan under which the plan pays the organization on a fixed, periodic or capitated basis, and the financial risk for the cost of services provided pursuant to the contractual arrangement is assumed by the organization."

13

2. Characterization of HCP Under the Knox-Keene Act

Hambrick has not asserted in the trial court or on appeal that HCP meets the statutory definition of a health care service plan as one that "undertakes to arrange for the provision of health care services to subscribers or enrollees . . . in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (§ 1345, subd. (f)(1).) Indeed, Hambrick alleges that she made payments for medical care to an organization other than HCP, which in turn made payments to HCP for her medical care.

Instead, in her opening brief, Hambrick argues that "MGI is assuming global healthcare risk and so is acting as a health plan." When asked at oral argument on what basis a court should determine whether HCP is a health care service plan under section 1345, subdivision (f)(1), or a medical group serving as a risk-bearing organization under section 1375.4, subdivision (g), Hambrick's counsel responded that this determination can be made by reviewing HCP's contracts to determine whether it is accepting "global risks." Counsel argued: "You can have capitation agreements but not to the point that you are accepting global risk without a license."

When asked where the court would find a definition of unacceptable global risk, Hambrick's counsel responded that the court should look at the definition in section 1349.2, subdivision (a)(3), for the definition of fee-for-service. This section currently provides that one of the conditions for a health care service plan that provides health care *for public entities* to be exempt from the licensing requirements is that "providers are reimbursed solely on a fee-for-service basis, so that providers are not at risk in contracting arrangements." (*Id.*, subd. (a)(3).)

It is not the case, however, that a risk-bearing organization cannot accept any per-patient payments under capitation agreements without becoming a health care service plan. Rather, as we discuss above, licensed health care service plans may contract with risk-bearing organizations that "[r]eceive[] compensation for those services on any

14

capitated or fixed periodic payment basis."[13]  (§ 1375.4, subd. (g)(1)(B).)  Similarly, section 1348.6, subdivision (b), allows a health care service plan to make payments to a physician group, including "general payments, such as capitation payments."[14]

Further, as our colleagues in the Fourth District have held, "the Legislature has specifically approved of various risk-shifting arrangements including capitation payments." (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 162, fn. omitted; accord, *Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 789 (*Desert Healthcare*).)  "Similarly, administrative regulations contemplate the contractual shifting of financial risk from health plans to other risk-bearing entities." (*California Medical Assn.*, *supra*, at p. 162.)

Alternatively, Hambrick appears to be requesting that this court consider a prior version of section 1349.3 that was repealed effective January 1, 2002, and thus is not applicable here.  The only reference in the record to the former section 1349.3 is the memorandum entitled, "Overview of Risk-Sharing Arrangements," which was prepared by the Financial Solvency Standards Board (FSSB)[15] for a January 29, 2002 meeting of

---

[13]    HCP appears to argue that it is more properly characterized as a risk-bearing organization.  At oral argument, HCP's counsel argued:  "Not all risk-bearing organizations are health care service plans, and health care service plans are not easily or readily defined by the statute."

[14]    Section 1348.6, subdivision (b), provides that contracts between a health care service plan and a physician group or physician may include "incentive plans that involve general payments, such as capitation payments, or shared-risk arrangements that are not tied to specific medical decisions involving specific enrollees or groups of enrollees with similar medical conditions. . . ."

[15]    The Legislature established the FSSB in 1999 in section 1347.15.  (Stats. 1999, ch. 529, § 1 (Sen. Bill No. 260).)  Subdivision (a) of section 1347.15 provides:  "There is hereby established in the [DMHC] the [FSSB] composed of eight members. . . ."  The stated purpose of the FSSB is to "(1) Advise the director on matters of financial solvency affecting the delivery of health care services.  [¶]  (2) Develop and recommend to the director financial solvency requirements and standards relating to plan operations, plan-affiliate operations and transactions, plan-provider contractual relationships, and provider-affiliate operations and transactions.  [¶]  (3) Periodically monitor and report on

15

the DMHC (FSSB Memo), which document has been referenced by both parties in their briefs and oral argument.[16]  The FSSB Memo states as to section 1349.3, after acknowledging that it has been repealed:  "This provision restated the general proposition, that a health plan may not contract with anyone but a licensed health care plan 'for the assumption of financial risk with respect to the provision of both institutional and non-institutional health care services and any other form of global capitation.'"

We are not aware of any current provision of the Knox-Keene Act or the DMHC regulations that defines "global risk" or states that a risk-bearing organization taking on global risk thereby is transformed into a health care service plan.  Rather, it appears that Hambrick seeks for the court to consider the now-repealed section 1349.3, as interpreted by the FSSB Memo, to find that HCP, by entering into "global capitation" agreements with a health care service plan, is itself a health care service plan.

The challenge for Hambrick, however, is that neither the repealed section of the Knox-Keene Act nor the FSSB Memo is controlling law on the definition of a health care service plan.  Moreover, even if the court were to find that a medical group accepting "global risk" must have a license under the Knox-Keene Act as a health care service plan, nowhere does the Knox-Keene Act or DMHC's regulations define what level of risk would cause a risk-bearing organization to become a health care service plan.  Rather, this is a regulatory decision that would need to be made by the DMHC in deciding whether HCP needs a license.  Having the court decide the level of acceptable risk that a medical group may bear without becoming a health care service plan would cause the

---

the implementation and results of the financial solvency requirements and standards." (*Id.*, subd. (b).)

[16]     As we discuss below, we take judicial notice of the FSSB Memo for the limited purpose of providing context to the parties' arguments, but not as a statement of FSSB's or DMHC's interpretation of the law.

16

court to wade into the complex economic policy and regulatory framework that are better left to the DMHC.

## B. *The FSSB Memorandum*

In support of her opposition to the demurrers, Hambrick asked the trial court to take judicial notice of the FSSB Memo. It does not appear from the record that the trial court ruled on this request. At oral argument, however, counsel for both sides referred repeatedly to the document. When asked to what an entity would refer when determining whether it needed a license, counsel for the HCP defendants responded in part by referring to the FSSB Memo. Similarly, in the HCP defendants' brief they cite to the FSSB Memo.

Because both parties relied on the document at oral argument and it can be found on the DMHC's website (www.dmhc.ca.gov),[17] we take judicial notice of the document on appeal, but only to the extent it gives meaning to the parties' arguments. (Evid. Code, §§ 452, 459; see *Sierra Pacific Holdings, Inc. v. County of Ventura* (2012) 204 Cal.App.4th 509, 512, fn. 1 [taking judicial notice of Federal Aviation Administration advisory circular pursuant to Evid. Code, §§ 452, subd. (b), 459]; *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 886, fn. 1 [taking judicial notice of notice of agenda for water district's board meeting and a notice to landowners pursuant to Evid. Code, § 452, subds. (b) and (h)]; *Empire Properties v. County of Los Angeles* (1996) 44 Cal.App.4th 781, 788, fn. 2 [taking judicial notice of 1979 report of the task force of property task administration pursuant to Evid. Code, §§ 452, subd. (h), 459].)

According to the FSSB Memo, its purpose was "to facilitate a more focused discussion regarding some common forms of risk arrangements and certain regulatory policy issues they raise." Thus, the FSSB Memo was never adopted by either the FSSB or DMHC as a guidance document for when a medical group would be characterized as a

---

[17] http://www.dmhc.ca.gov/Portals/0/AbouttheDMHC/FSSB/Meetings/ a020129_info.pdf (as of June 1, 2015).

17

health care service plan. The FSSB Memo provides: "Although it is unlawful for any person to engage in the business of a health plan or to undertake to arrange for the provision of health care services in return for prepaid or periodic consideration without first securing a Knox-Keene license, [under section] 1349, health care providers operating within the scope of their license are impliedly exempt from this requirement. Based on this implied exemption, health plans contract with a variety of health care providers on a prepaid or periodic basis who then become responsible for furnishing actual health care services to health plan enrollees. . . . (. . . § 1375.4[, subd.] (a)(1).) If a plan maintains capitation or risk-sharing contracts, it must ensure that each contracting provider has the administrative and financial capacity to meet its contractual obligations. [California Code of Regulations, title 28, section] 1300.70[, subdivision] (b)(2)(H)(1)." (Fn. & italics omitted.)

The FSSB Memo further explains that "[t]he bulk of health plan delegation involves contracting with risk-bearing organizations" as that term is defined in section 1375.4, subdivision (g)(1). "Risk arrangements usually fall within one of three basic structures: full risk, shared risk or global risk arrangements." "Full risk ('dual risk') contracting is often used to describe the situation where a health plan enters into multiple capitation agreements to shift the majority of the risk for the provisions of health care services to providers. Typically, a health plan will capitate a hospital to provide, arrange and pay for institutional risk, which typically includes a combination of hospital, skilled nursing and hospice care. The health plan also capitates a physician network that is closely associated with the hospital to provide, arrange and pay for professional risk, which typically includes physician and ancillary provider services. Either or both of these capitation arrangements may include additional risk arrangements for home health care, ambulance, durable medical equipment, corrective appliances, pharmacy, and injectibles."

Next, the FSSB Memo states that the term "[s]hared risk contracting is often used to describe the situation where a health plan enters into a capitation agreement with a physician organization to render professional services, but does not enter into a capitation

18

arrangement with a hospital.  In these situation[s] the health plan 'retains' the institutional risk, but requires the provider organizations to participate in . . . one or more risk arrangements relating to the provision of institutional services. . . ."

Finally, the FSSB Memo explains that "[g]lobal risk contracting" occurs "where a health plan enters into a capitation agreement with only one health care provider to shift the entire risk for the provision of both institutional and professional health care services to a single entity. . . . *This type of contracting is limited to organizations that have secured a Knox-Keene license or a Knox-Keene license with waivers.*"  (Italics added; fn. omitted.)

In discussing a possible approach to evaluating the "appropriateness" of current risk arrangements, the FSSB Memo observes that "[c]onsideration of risk sharing arrangements is a complex topic" that "is complicated further by a statutory/regulatory structure that provides limited guidance."  The memorandum continues:  "Historically, licensed health care providers were impliedly exempted from the [s]ection 1349 licensure requirements for services falling within the scope of their professional health care license. Unfortunately, little regulatory guidance evolved to define the scope of health care services that appropriately fell within the licensure of each individual health care professional.

"Partially in response to the increasing scope of delegated financial risk for the provisions [*sic*] of health care services and partially in response to a number of well publicized medical group bankruptcies, the Legislature, as part of the enactment of [Senate Bill No.] 260 enacted . . . [s]ection 1349.3.  This provision restated the general proposition, that a health plan may not contract with anyone but a licensed health care plan 'for the assumption of financial risk with respect to the provision of both institutional and non-institutional health care services and any other form of global capitation.'

"While [s]ection 1349.3 contained a sunset clause automatically repealing this provision on January 1, 2002, the import of this section—that whenever a physician organization is placed at financial risk for 'institutional' health care services, it has

19

wandered into the area of 'global' capitation, which is a prohibited activity—remains current law.  As such, additional guidance as to the meaning of 'institutional[,'] 'non-institutional' and 'forms of global risk' is still needed."

The memo then suggests "two threshold questions" as a "starting point" for the FSSB "to study the 'appropriateness' of risk arrangements":  "(1) what constitutes institutional services; and (2) when has financial risk for institutional services been contractually assigned to a provider organization."

With respect to the first question, the FSSB Memo observes that "[c]urrent regulatory interpretation suggests that health plans cannot delegate the assumption of financial risk for 'institutional' services to medical groups without effectively engaging in the prohibited practice of 'global capitation.'  Before determining whether the risk associated with a given category of costs has been 'passed' to a provider thereby creating a form of global risk, one must delineate which cost categories constitute institutional care."

The FSSB Memo then notes that "[a]rguably, the brightest line for institutional risk is direct facility charges for both inpatient and outpatient services.  Beyond this bright line appears a large gray area."  It then suggests that "[o]ne possible criterion for determining if a service category should be classified as institutional versus non-institutional would be to look to the physician organization's licensure.  Specifically, any service for which the physician is licensed to perform would constitute non-institutional risk; all remaining categories would default into the institutional category. . . ."

After suggesting possible resolutions for the question of what constitutes an institutional risk, the FSSB Memo turns to the second threshold question, noting that "[o]nce a determination is made regarding what constitutes institutional services, a determination must be made as to whether or not the financial risk associated with providing those services has been contractually assumed by a provider organization."

20

**C.** *The Trial Court Acted Within Its Discretion in Invoking the Judicial Abstention Doctrine as to Hambrick's UCL and FAL Causes of Action*

  1. Standard of Review

  A trial court's decision to dismiss a lawsuit or a cause of action based on the doctrine of judicial abstention is reviewed for abuse of discretion.  (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 482 (*Arce*); accord, *Acosta v. Brown* (2013) 213 Cal.App.4th 234, 244 (*Acosta*).)  A trial court abuses its discretion when its decision exceeds the bounds of reason by being arbitrary, capricious or patently absurd in light of the circumstances.  (*People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484; *People ex rel. Harris v. Black Hawk Tobacco, Inc.* (2011) 197 Cal.App.4th 1561, 1567.)  "Unless there has been a clear miscarriage of justice, a reviewing court will not substitute its opinion for that of the trial court so as to avoid divesting the trial court of its discretionary power."  (*Medical Bd. of California v. Chiarottino* (2014) 225 Cal.App.4th 623, 628.)  "'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"  (*Arce*, *supra*, at p. 482, quoting *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)

  "It must be remembered, however that '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ."  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.  [Citation.]  If the trial court is mistaken about the scope of its discretion, the mistaken position may be "reasonable", i.e., one as to which reasonable judges could differ.  [Citation.]  But if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law.' [Citation.]"  (*Acosta*, *supra*, 213 Cal.App.4th

at p. 258; accord, *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1361 ["'[a] trial court's decision that rests on an error of law is an abuse of discretion'"] (*Klein*).)[18]

### 2. The Abstention Doctrine

Under the abstention doctrine, "a trial court may abstain from adjudicating a suit that seeks equitable remedies if 'granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency.' [Citation.]" (*Arce*, *supra*, 181 Cal.App.4th at p. 496.) Abstention may also be appropriate if "'the lawsuit involves determining complex economic policy, which is best handled by the Legislature or an administrative agency,'" or if "'granting injunctive relief would be unnecessarily burdensome for the trial court to monitor and enforce given the availability of more effective means of redress.'" (*Ibid*.; accord, *Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 138, 157 (*Blue Cross*).) In addition, as we held in *Klein*, "abstention is generally appropriate only if there is an alternative means of resolving the issues raised in the plaintiff's complaint." (*Klein*, *supra*, 202 Cal.App.4th at p. 1369.)

Many courts have addressed the question whether abstention is appropriate in the context of UCL or FAL claims for violation of the Knox-Keene Act. In *Arce*, we considered whether the trial court abused its discretion by abstaining from adjudicating a UCL claim that Kaiser violated the Knox-Keene Act and Mental Health Parity Act by categorically denying plan members with autism spectrum disorders coverage for behavioral and speech therapy. In holding that the trial court was well-equipped to

---

[18] Hambrick contends that the demurrer was based on speculative arguments and matters outside the four corners of the first amended complaint or not subject to judicial notice. However, the trial court's decision to sustain the HCP defendants' demurrers without leave to amend was not based on a determination that Hambrick failed to plead her three causes of action, but rather on the factors underlying the abstention doctrine. Hambrick cites no authority for the proposition that in deciding whether to abstain the trial court was limited to the four corners of the first amended complaint.

determine whether Kaiser's denial violated the Knox-Keene Act, we found that "the Legislature already has made the relevant policy determinations in mandating that health care plans provide coverage for the medically necessary treatment of autism under the same terms and conditions applied to other medical conditions." (*Arce*, *supra*, 181 Cal.App.4th at p. 501.) Therefore, the determination of whether the therapies at issue were "'health care services'" under the Mental Health Parity Act and the Knox-Keene Act "are issues of statutory interpretation that are well suited for adjudication by the courts." (*Ibid.*)

Further, we found that "resolution of the UCL claim would not call upon the court to engage in individualized determinations of medical necessity for each putative class member, but rather to perform the basic judicial functions of contractual and statutory interpretation. To determine whether Kaiser systematically breached its health plan contract by denying coverage for applied behavior analysis therapy and speech therapy for autism spectrum disorders, the trial court would need to interpret the relevant terms of the contract, and decide whether the therapies are or are not covered services." (*Arce*, *supra*, 181 Cal.App.4th at p. 499.) We noted further that the interpretation of contracts "is primarily a judicial function." (*Id.* at p. 500.)

We also concluded that the other traditional grounds for invoking the abstention doctrine did not apply. Specifically, we found that "there is no indication that granting injunctive or declaratory relief in this action would be unnecessarily burdensome for the trial court." (*Arce*, *supra*, 181 Cal.App.4th at p. 500.) It addition, resolution of Arce's UCL claim "would not call upon the court to determine complex issues of economic or health policy" (*id.*, at p. 500); nor would it "require the trial court to assume or interfere with the functions of an administrative agency" (*id.* at p. 501).

Similarly, in *Blue Cross of California, Inc. v. Superior Court* (2009) 180 Cal.App.4th 1237, this district upheld the trial court's decision declining to abstain from adjudication of a lawsuit brought by the city attorney seeking relief under the UCL and FAL for Blue Cross's postclaims underwriting practices, alleging violation of the Knox-Keene Act. The court affirmed the trial court's decision, finding that "the city attorney is

asking the court to perform an ordinary judicial function, namely, to grant relief under the UCL and the FAL for business practices that are made unlawful by statute. The relief requested by the city attorney will not interfere with the functions of either the [Department of Insurance] or the DMHC, including the relief that those agencies have already secured by settlements." (*Id*. at p. 1258.)

In this case, by contrast, HCP does not fall within the definition of a "health care service plan" under the plain language of the Knox-Keene Act in section 1345, subdivision (f)(1), because Hambrick paid her premiums to an unidentified health care service plan, not to HCP. Hambrick does not argue otherwise, but maintains that HCP nevertheless is required to be licensed under the Knox-Keene Act because it assumed the global risk of institutional or hospital care. The parties appear to agree that a determination of whether HCP operates as a health care service plan depends on whether it has assumed the "global risk" of hospital care under capitation agreements it has with the unidentified health care service plan to which Hambrick paid her premiums.

In contrast to *Arce* and *Blue Cross*, this determination has not been made by the Legislature. Nowhere in the Knox-Keene Act is there a definition of what level of risk assumed by a medical group under a capitation agreement would cause it to be characterized as a health care service plan. Neither has the DMHC provided any guidance in its regulations. Rather, Hambrick asks us to make this determination by relying upon the FSSB Memo, which has never been formally adopted by the FSSB or the DMHC.

We find that the determination of the level of financial risk under a capitation agreement that causes a "risk-bearing organization" under section 1375.4, subdivision (g), to become a "health care service plan" under section 1345 is precisely the type of regulatory determination involving complex economic policy that should be made by the DMHC in the first instance. This issue of the transfer of risk under capitation agreements from a health care service plan to a medical group was squarely before the court in *Desert Healthcare*, *supra*, 94 Cal.App.4th 781.

24

In *Desert Healthcare*, our colleagues in the Fourth District held: "The instant case is a perfect example of when a court of equity should abstain. Desert Healthcare essentially argues that PacifiCare abused the capitation system by transferring too much risk to its intermediary without adequate oversight. In order to fashion an appropriate remedy for such a claim, be it injunctive or restitutionary, the trial court would have to determine the appropriate levels of capitation and oversight. Such an inquiry would pull the court deep into the thicket of the health care finance industry, an economic arena that courts are ill-equipped to meddle in. As such, there is no proper role for the court of equity to play in the instant dispute."[19] (*Desert Healthcare*, *supra*, 94 Cal.App.4th at pp. 795-796.)

Other courts have similarly abstained from adjudicating UCL and FAL claims for violations of the Knox-Keene Act and similar health care laws where determination of the claims would require the court to assume the regulatory powers of the designated administrative agency. (See, e.g., *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292, 1306 [abstention upheld as to UCL claims for insufficient nursing hours per patient under applicable health care law] (*Alvarado*); *Samura v. Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301 [abstention upheld as to UCL claims for third party liability provisions alleged to be unlawful under Knox-Keene

---

[19]    In *Desert Healthcare*, the owner of a hospital sued PacifiCare, a health care service plan licensed under the Knox-Keene Act. Similar to the arrangement alleged here, PacifiCare contracted with Desert Physicians Association (DPA) to provide medical services to subscribers of PacifiCare. Pursuant to their "capitation agreement," "PacifiCare paid DPA a flat fee per person to provide physicians and obtain hospital services for PacifiCare's subscribers." (*Desert Healthcare*, *supra*, 94 Cal.App.4th at p. 785.) DPA, in turn, contracted with Desert Healthcare to obtain hospital services for PacifiCare's subscribers. (*Ibid*.) After DPA filed for bankruptcy and extinguished its debts, Desert Healthcare sought to recover millions of dollars it had spent for hospital services provided to subscribers of PacifiCare. (*Ibid*.) Desert Healthcare asserted UCL claims based on the Knox-Keene Act against PacifiCare based on "PacifiCare's practice of requiring waivers from its providers and refusing to pay claims for which it had received premiums." (*Id.* at pp. 785-786, fn. omitted.)

25

Act]; see also *Acosta*, *supra*, 213 Cal.App.4th at p. 251 [trial court did not abuse its discretion in invoking the abstention doctrine where petitioners were "asking the trial court to replicate administrative responsibilities imposed by law on the [Department of Labor]" to devise, monitor and enforce the Social Security Act timeliness requirements].)

In *Samura*, a health care plan member brought UCL claims against Kaiser for third-party liability provisions in service agreements that the member alleged violated the Knox-Keene Act. The First District reversed the trial court's order issuing an injunction, finding that the acts were not specifically made unlawful under the Knox-Keene Act. (*Samura v. Kaiser Foundation Health Plan, Inc.*, *supra*, 17 Cal.App.4th at p. 1301.) Accordingly, the court held, "[i]n basing its order on these provisions [in the Knox-Keene Act], the trial court assumed a regulatory power over [the defendants] that the Legislature has entrusted exclusively to the Department of Corporations. . . . [T]he courts cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing Business and Professions Code section 17200." (*Id*. at pp. 1301-1302.)

Similarly, in *Alvarado*, the plaintiff filed a class action alleging causes of action under the UCL and FAL against skilled nursing and intermediate care facilities to require the facilities to comply with statutory requirements for the minimum number of nursing hours per nursing patient. The statute required the Department of Health Care Services to adopt regulations setting forth the minimum number of hours per patient required in each type of facility. (*Alvarado*, *supra*, 153 Cal.App.4th at p. 1303.)

Our colleagues in Division Three affirmed the trial court's reliance on the abstention doctrine, finding that "[a]djudicating this class action controversy would require the trial court to assume general regulatory powers over the health care industry through the guise of enforcing the UCL, a task for which the courts are not well equipped. [Citation.]" (*Alvarado*, *supra*, 153 Cal.App.4th at pp. 1303-1304.) In reaching this conclusion, the court detailed the complex factors that it would need to analyze to determine whether a particular facility was providing the required number of

nursing hours. The court concluded that this was "a task better accomplished by an administrative agency than by trial courts." (*Id*. at p. 1306.)

    3. Hambrick has failed to show that the trial court abused its discretion in abstaining from adjudicating her UCL and FAL claims.

Hambrick urges us to follow this district's holding in *Blue Cross* by finding that the trial court would perform solely a judicial function in resolving her UCL and FAL claims. (See *Blue Cross of California, Inc. v. Superior Court*, *supra*, 180 Cal.App.4th 1237.) Hambrick cites to section 1349 as support for her argument that "the Legislature has already made the policy determination that an entity engaging in specific types of practices must be licensed under the Knox-Keene Act in order to engage in those practices." However, section 1349 states only that it is unlawful to engage in business as a health care service plan without first obtaining a Knox-Keene Act license from the director of the DMHC.[20] It sheds no light on the circumstances under which a medical group that does not fall within the definition of a health care service plan under section 1349, but which contracts with a health care service plan to assume the risk of institutional or other medical care, must obtain a license under the Knox-Keene Act. Indeed, other than the FSSB Memo, which does not have the force of law, Hambrick has not cited any statutory provision or regulation that would guide a trial court's resolution of this issue.

As we discuss above, while abstention is not appropriate where resolution of the issues involves solely the judicial function of resolving questions of law based on facts before the court (see *Arce*, *supra*, 181 Cal.App.4th at p. 478; *Blue Cross of California, Inc. v. Superior Court*, *supra*, 180 Cal.App.4th at p. 1242), abstention is appropriate

---

[20] Hambrick also relies on section 1253, subdivision (a). Section 1253 is not part of the Knox-Keene Act. It is a general licensing statute that requires a person or entity operating a health facility in California to obtain a license enabling it to do so. (See §§ 1250, 1251, 1253, subd. (a).) Because Hambrick at no time alleged that HCP operated a "health facility," her reliance on section 1253 is misplaced.

where resolution of a case would require the court to assume general regulatory powers and determine complex economic policies (see *Alvarado*, *supra*, 153 Cal.App.4th at pp. 1295-1296; *Desert Healthcare*, *supra*, 94 Cal.App.4th at p. 785).

In this case, the determination of whether HCP was required to be licensed would, as the trial court aptly noted, "require[] a detailed analysis of complex corporate structures, of risk allocation via service provider 'cap[it]ation' contracts of the cost of providing medical care, and many related factual and legal issues." The court therefore would be required to determine complex economic policy within the context of the managed health care system. This is a task properly left to the director of the DMHC. Any contrary conclusion would require the trial court to assume the functions of the director of the DMHC and effectively usurp the director's powers.

**D.  *Hambrick Has an Alternative Forum To Resolve Her Claims*[21]**

As we note above, "abstention is generally appropriate only if there is an alternative means of resolving the issues raised in the plaintiff's complaint." (*Klein*, *supra*, 202 Cal.App.4th at p. 1369.) However, our decision in *Klein* rested on different circumstances. There, we held that there was no alternative remedy for Klein's claims under the UCL and Consumer Legal Remedies Act for Chevron's failure to compensate for temperature variations in retail motor fuel, which resulted in consumers receiving less motor fuel, as measured by mass and energy, than they would receive if Chevron adjusted for temperature increases. Chevron argued that the court should abstain in light of a report by the California Energy Commission analyzing the costs and benefits of implementing fuel pumps at retail stations that would remedy the temperature variations. (*Ibid*.)

---

[21]     Pursuant to our March 6, 2015 request, the parties submitted letter briefs discussing the remedies the director of the DMHC may order for violations of the licensing provisions of the Knox-Keene Act.

28

We found that "[t]he fact that the Legislature has required an agency to investigate remedies to a potentially problematic business practice is not, standing alone, sufficient to support judicial abstention." (*Klein*, *supra*, 202 Cal.App.4th at p. 1369.) We concluded that "to abstain from deciding the issues plaintiffs have raised in their complaint means that those issues will remain unresolved unless the Legislature decides to intervene, which may never occur." (*Id*. at p. 1370.)

In reaching our holding, we distinguished four prior cases in which the courts upheld abstention after finding there were adequate alternative remedies. (See *Klein*, *supra*, 202 Cal.App.4th at p. 1371, citing to *Wolfe v. State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 567-568 [abstention appropriate where Legislature had addressed problem of availability of earthquake insurance and expressed intent to continue to address issue]; *Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 642 [abstention proper where Legislature established regulatory framework to address "complex statutory arrangement of requirements and incentives involving participants in the beverage container recycling scheme" administered by Department of Conservation]; *Alvarado*, *supra*, 153 Cal.App.4th at p. 1305 [Legislature intended the Department of Health Care Services (DHCS) to enforce statute mandating nursing hours per patient];[22] *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1365-1366 [abstention appropriate in light of ongoing

---

[22]     The court in *Alvarado* also noted that if the DHCS failed to act, the plaintiffs were free to pursue a writ of mandate to compel DHCS to comply with its duty to enforce the nursing hours mandate in section 1276.5. (*Alvarado*, *supra*, 153 Cal.App.4th at p. 1306 & fn. 5 ["[n]othing in this opinion is intended to preclude plaintiff from pursuing appropriate writ relief pursuant to the Code of Civil Procedure to compel the DHCS . . . to enforce the requirement that 'the minimum number of actual nursing hours per patient required in a skilled nursing facility shall be 3.2 hours"].) Similarly, here the Legislature intended for the DMHC to exercise its regulatory authority under sections 1349 and 1391 to insure that health care service plans obtain licenses under the Knox-Keene Act and, if it fails to carry out this enforcement authority, review by a writ of mandate may likewise be available to Hambrick.

29

administrative proceedings to address killing of birds by wind turbine electric generators].)

As the First District held in *Center for Biological Diversity*, "[t]he courts are available to review the responses of those agencies, but they are not available to supersede their role in the regulatory process." (*Center for Biological Diversity, Inc. v. FPL Group, Inc.*, *supra*, 166 Cal.App.4th at p. 1372; see also *Willard v. AT&T Communications of California, Inc*. (2012) 204 Cal.App.4th 53, 60 [finding no abuse of discretion where trial court abstained from deciding UCL claims based on alleged excessive fees for unpublished telephone numbers where pricing involved complex economic policy issues and plaintiffs could seek relief from PUC].)

Contrary to the facts in *Klein*, as we discuss below, the DMHC both has the power to enforce the Knox-Keene Act, and has repeatedly issued cease and desist orders that require health care service plans to obtain the required licenses, enjoin deceptive and misleading business practices and advertising, and order restitution. We therefore find that this case more closely tracks the facts in *Wolfe*, *Shamsian*, *Alvarado*, and *Center for Biological Diversity* in ensuring that Hambrick will have a remedy for her claims.

We next turn to the remedies available under the UCL and FAL, and those that can be ordered or sought by the DMHC.


1. Available Remedies Under the UCL and FAL

Section 17200 of the Business and Professions Code prohibits "unfair competition," which means and includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200; *Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370 (*Zhang*); *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143.) In prohibiting "unlawful" business practices, "the UCL '"borrows"' rules set out in other laws and makes violations of those rules independently actionable." (*Zhang*, *supra*, at p. 370; accord, *Rose v. Bank of America, N.A.* (2013) 57 Cal.4th 390, 396; *Korea Supply*, *supra*, at p. 1143; *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 610.) A

30

business practice or act that does not violate a statute may also violate the UCL because the UCL proscribes "unfair" and "fraudulent" business practices. (*Zhang*, *supra*, at p. 370; *Puentes v. Wells Fargo Home Mortgage, Inc.* (2008) 160 Cal.App.4th 638, 644.)

Business and Professions Code section 17500 of the FAL "prohibits the dissemination in any advertising media of any 'statement' . . . 'which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.' [Citation.]" (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 210.) False advertising under the FAL constitutes a fraudulent business practice under the UCL. (*Zhang*, *supra*, at p. 370; *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312, fn. 8; *Committee on Children's Television, Inc.*, *supra*, at p. 210.)

The UCL and FAL provide for only equitable relief, specifically injunctive relief and restitution. (See Bus. & Prof. Code, §§ 17203,[23] 17535.[24]) Further, "'[t]he restitutionary remedies of section[s] 17203 and 17535 . . . are identical and are construed in the same manner.'" (*People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539,

---

[23] Business and Professions Code section 17203 provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. . . ."

[24] Business and Professions Code section 17535 provides: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

31

1548, citing *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177, fn. 10; accord, *Zhang*, *supra*, 57 Cal.4th at p. 371; *Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 769.)[25]

Our Supreme Court has "made it clear that 'an action under the UCL "is not an all-purpose substitute for a tort or contract action." [Citation.] Instead, the act provides an equitable means through which both public prosecutors and private individuals can bring suit to prevent unfair business practices and restore money or property to victims of these practices. As we have said, the "overarching legislative concern [was] to provide a streamlined procedure for the prevention of ongoing or threatened acts of unfair competition." [Citation.] Because of this objective, the remedies provided are limited.' [Citation.] Accordingly, while UCL remedies are 'cumulative . . . to the remedies or penalties available under all other laws of this state' (Bus. & Prof. Code, § 17205), they are narrow in scope." (*Zhang*, *supra*, 57 Cal.4th at p. 371.)

Further, the equitable remedies under the UCL and FAL "are subject to the broad discretion of the trial court." (*Zhang*, *supra*, 57 Cal.4th at p. 371.) Therefore, "restitutionary or injunctive relief is not mandatory; rather, equitable considerations may guide the court's discretion in fashioning a remedy for a UCL violation." (*Nelson v. Pearson Ford Co.* (2010) 186 Cal.App.4th 983, 1015, citing *Cortez v. Purolator Air Filtration Products Co.*, *supra*, 23 Cal.4th at p. 180.) As the court held in *Zhang*, "[t]he UCL does not *require* 'restitutionary or injunctive relief when an unfair business practice has been shown. Rather, it provides that the court "*may* make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practice which constitutes unfair competition . . . or as may be necessary to restore . . . money or property."' [Citation.]" (*Zhang*, *supra*, 57 Cal.4th at p. 371, citing *Cortez*, *supra*, at p. 180.)

---

[25]     Because the UCL and FAL provide for the same remedies, we will focus on remedies under the UCL, which have been addressed more frequently by the courts.

a. *Injunctive Relief*

In her UCL and FAL causes of action, Hambrick seeks injunctive relief prohibiting the HCP defendants from violating the Knox-Keene Act, the UCL and FAL and other statutory provisions. Hambrick specifically seeks to enjoin the HCP defendants from operating without a Knox-Keene license and to "enjoin [the HCP defendants] from their misleading advertising." It is undisputed that injunctive relief is available under both the UCL and the FAL. (See Bus. & Prof. Code, §§ 17203, 17535.)

b. *Restitution*

Hambrick seeks "restitution and disgorgement of all excess profits and ill-gotten gains." Specifically, Hambrick seeks to recover "all capitation paid to [the HCP defendants], and all co-pays, deductibles and co-insurance payments" she paid to the HCP defendants.

As noted above, both the UCL and FAL provide for recovery of restitution. However, Hambrick's request for relief goes beyond the scope of restitution. Our Supreme Court has defined restitution as "the return of money or other property obtained through an improper means to the person from whom the property was taken. [Citations.] 'The object of restitution is to restore the status quo by *returning to the plaintiff* funds in which he or she has an ownership interest.' [Citation.]" (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 614.)

As the court held in *Zhang*, restitution under the UCL "'is confined to restoration of any interest in "money or property, real or personal, which may have been *acquired* by means of such unfair competition." . . . A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other.' [Citation.]" (*Zhang*, *supra*, 57 Cal.4th at p. 371.)

Co-payments, deductibles, and co-insurance payments made by Hambrick to HCP as a result of its unfair business practices or false advertising are properly characterized as restitution that may be recovered on Hambrick's UCL and FAL claims. (*Zhang*,

33

*supra*, 57 Cal.4th at p. 371.)  However, with respect to Hambrick's claim to recover money paid by the unidentified health care service plan to HCP under a capitation agreement, this is not recoverable by Hambrick as restitution because this is not money in which Hambrick has an ownership interest or that was "lost by a plaintiff."  (*Ibid*.)

Similarly, "nonrestitutionary disgorgement of profits"[26] is not recoverable in a UCL action.  (*Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at p. 1152.)  In the absence of an "indicat[ion] that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits" (*id.* at p. 1147), "disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution."  (*Id*. at p. 1145; accord, *Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 229; see also *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 121 ["disgorgement into a fluid recovery fund is not a remedy available" in a representative UCL action].)

c.  *Attorneys Fees*

Hambrick also seeks to recover attorneys fees under Code of Civil Procedure section 1021.5.  The courts have consistently held that attorneys fees are not recoverable in a UCL or FAL action.  (*Rose v. Bank of America, N.A.*, *supra*, 57 Cal.4th at p. 399; *Zhang*, *supra*, 57 Cal.4th at p. 371; *Korea Supply Co. v. Lockheed Martin Corp.*, *supra*, 29 Cal.4th at pp. 1144, 1148, 1150.)  However, while Hambrick cannot recover attorneys fees under the UCL or FAL, "a prevailing plaintiff may seek attorney fees as a private attorney general under Code of Civil Procedure section 1021.5" in an appropriate case.

---

[26]    "Disgorgement as a remedy is broader than restitution or restoration of what the plaintiff lost. [Citations.]  There are two types of disgorgement: restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment.  [Citation.]"  (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1482, fn. omitted.)

(*Zhang*, *supra*, at p. 371, fn. 4; accord, *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1179.)

"[A]n award under [Code of Civil Procedure] section 1021.5 requires a showing that (1) the litigation enforced an important right affecting the public interest; (2) it conferred a significant benefit on the general public or a large class of persons; and (3) the necessity and financial burden of private enforcement (or enforcement by one public entity against another) were such as to make the award appropriate. [Citation.] Since the statute states the criteria in the conjunctive, each element must be satisfied to justify a fee award. [Citation.] . . . [¶] The third element, the necessity and financial burden requirement, involves two issues: ""'whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.'"" [Citation.]" (*Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45, 55.)

Thus, while Code of Civil Procedure section 1021.5 provides a potential basis for Hambrick to recover her attorneys fees, she would need to meet the three elements necessary to recover attorneys fees under Code of Civil Procedure section 1021.5 in addition to prevailing on her UCL or FAL claims.

We next turn to the remedies available to Hambrick through the director of the DMHC.

2. Powers of the Director of the DMHC

a. *Injunctive Relief*

Section 1391, subdivision (a)(1), provides that "[t]he director [of the DMHC] may issue an order directing a plan, solicitor firm, or any representative thereof, a solicitor, or any other person to cease and desist from engaging in any act or practice in violation of the provisions of this chapter, any rule adopted pursuant to this chapter, or any order issued by the director pursuant to this chapter." Further, if a written request for hearing is not filed within 30 days of the date the order is served, "the order shall be deemed a final

35

order of the director and shall not be subject to review by any court or agency, notwithstanding subdivision (b) of Section 1397." (*Id.*, subd. (a)(2).)

Hambrick argues that the director only has power to regulate a licensed plan under the Knox-Keene Act, and therefore cannot issue injunctive relief against an unlicensed plan. However, a review of the director's enforcement powers under section 1391 shows that the director's authority covers both licensed and unlicensed plans. For example, subdivision (c) of section 1391 provides: "If a timely request for a hearing is made by an unlicensed plan, the director may stay the effect of the order to the extent that the order requires the cessation of operation of the plan or prohibits acceptance of new members by the plan . . . ." Section 1391, subdivision (b), sets different rules applicable to a request for a hearing by a licensed plan.

The director of DMHC specifically has the authority to prevent unfair competition and false advertising. Section 1386, subdivision (b)(7), provides that the director may take disciplinary action, including suspending or revoking a plan's license or assessing administrative penalties where a "plan has engaged in any conduct that constitutes fraud or dishonest dealing or unfair competition, as defined by Section 17200 of the Business and Professions Code." Section 1360 similarly prohibits "the use of any advertising or solicitation which is untrue or misleading . . . ." (*Id.*, subd. (a).)

Indeed, the director of the DMHC has issued numerous cease and desist orders to entities operating as health care service plans without a Knox-Keene license, enjoining their operation and false advertising practices. (See, e.g., *In the Matter of International Association Benefits*, DMHC No. 04-459, Cease and Desist Order (July 29, 2009); *In the Matter of Prudent Choice, LLC*, DMHC No. 04-460, Cease and Desist Order (July 29, 2009); *In the Matter of First Choice Health Care Inc.*, DMHC No. 06-124, Cease and Desist Order (Apr. 10, 2006); *In the Matter of The Cappella Group, Inc. d/b/a Care Entrée*, DMHC No. 04-312, Cease and Desist Order (July 15, 2005); *In the Matter of*

*United Family Healthcare Group*, DMHC No. 04-374, Cease and Desist Order (July 15, 2005).)[27]

      b. *Restitution*

The director of DMHC has consistently ordered restitution as part of the cease and desist orders the director has issued to address false and deceptive business or advertising practices. For example, in *In the Matter of First Choice Health Care Inc.*, *supra*, in addition to enjoining First Choice's deceptive advertising practices, the court ordered First Choice to "refund all monies to demanding members without undue delay." (Cease and Desist Order, at p. 7.) Similarly, in *In the Matter of International Association Benefits*, *supra*, the director ordered that respondent "shall make refunds . . . to any enrollee who indicates a desire to cancel his or her membership, or to any enrollee who meets the legal standard for rescission." (Cease and Desist Order, at p. 7; see also *In the Matter of Prudent Choice, LLC*, *supra*, at p. 7 [ordering refunds to "any enrollee who indicates a desire to cancel his or her membership]; *In the Matter of The Cappella Group, Inc.*, *supra*, at p. 8 ["[r]espondent shall refund all monies to demanding members without undue delay"].)

The director has cited as authority for its orders its enforcement authority under section 1391, subdivision (a)(1), and the intent and purpose of the Knox-Keene Act, as set forth in sections 1341 and 1342, subdivision (c), to "[p]rosecut[e] malefactors who make fraudulent solicitations or who use deceptive methods, misrepresentations, or practices which are inimical to the general purpose of enabling a rational choice for the consumer public."

---

[27] On our own motion, we take judicial notice of these cease and desist orders submitted to the court with HCP's letter brief. (Evid. Code, §§ 452, subd. (c), 459; *Taiheiyo Cement U.S.A., Inc. v. Franchise Tax Bd.* (2012) 204 Cal.App.4th 254, 267, fn. 5 [court may take judicial notice of orders of administrative agencies]; *Klein*, *supra*, 202 Cal.App.4th at p. 1360, fn. 6 [same].)

The Knox-Keene Act also authorizes the director to bring an action in superior court or to request the Attorney General to bring an action to obtain injunctive and other "equitable relief." Specifically, section 1392, subdivision (a)(1), provides, "[w]henever it appears to the director that any person has engaged, or is about to engage, in any act or practice constituting a violation of any provision of this chapter, any rule adopted pursuant to this chapter, or any order issued pursuant to this chapter, the director may bring an action in superior court, or the director may request the Attorney General to bring an action to enjoin these acts or practices or to enforce compliance with this chapter, any rule or regulation adopted by the director pursuant to this chapter, or any order issued by the director pursuant to this chapter, or to obtain any other equitable relief." In addition, "[i]f the director determines that it is in the public interest, the director may include in any action authorized by paragraph (1) a claim for any ancillary or equitable relief and the court shall have jurisdiction to award this additional relief." (*Id*., subd. (a)(2).)

We interpret section 1392 to allow a court, upon the filing of an action by the director or the Attorney General under section 1392, to issue "equitable relief," including restitution. Accordingly, Hambrick may recover restitution (in this case, co-payments, deductibles, and co-insurance payments made by Hambrick to HCP) either as part of a cease and desist order issued by the director or in a superior court action filed by the director or the Attorney General, where restitution is in the public interest.

c. *Attorneys Fees*

The Knox-Keene Act does not provide statutory authority for the director of the DMHC to award attorneys fees.

3. Hambrick has an alternative means of resolving the issues raised in
   her complaint.

As we discuss above, the director has the authority to issue cease and desist orders or to seek an order from the superior court granting both injunctive relief and restitution.

38

While Hambrick also seeks disgorgement of profits, this is not available under either the UCL or FAL. Likewise, while the director does not have authority to award attorneys fees to Hambrick, attorneys fees are also not available under the UCL or FAL. While Hambrick potentially could obtain attorneys fees under the private attorney general statute, Code of Civil Procedure section 1021.5, the speculative possibility of Hambrick obtaining fees under that statute cannot alone support this court wading into the complex regulatory issues that should be determined by the director.

**E.** ***The Trial Court Abused Its Discretion in Abstaining from Adjudicating Hambrick's Second Cause of Action for Fraudulent Concealment, but Properly Dismissed the Cause of Action for Failure To State a Claim***

1. A Trial Court May Not Abstain Where Damages Are Sought

Hambrick correctly contends that the trial court should not have relied upon the judicial abstention doctrine to dismiss her second cause of action for fraudulent concealment because it included a claim for damages. Only when equitable relief is the sole relief sought may the trial court invoke the doctrine of judicial abstention.[28] (*Shuts v. Covenant Holdco LLC* (2012) 208 Cal.App.4th 609, 625.)

In her second cause of action for fraudulent concealment, Hambrick alleges that "Plaintiffs suffered damages caused thereby including but not limited to physical injuries, emotional injuries, loss of income, future medical expenses, co-pays or co-insurance payments to the hospitals." The prayer in the first amended complaint seeks "[s]pecial and general damages according to proof for JANDRES and each member of the Class,"

---

[28] In its written ruling, the trial court stated that "common-law fraud claims . . . hardly ever qualify for class treatment" and that "[t]he real nub of the case . . . is the equitable UCL claim and [FAL] claim." At the hearing on the demurrers, the trial court noted, "Well, in a hyper-technical sense you could get damages for the fraud claim, but because the particularity of the elements of common law fraud, fraud claims in truth really never shape up for class actions . . . ." Whether the fraud claim would qualify for class treatment is not relevant to whether the trial court had discretion to abstain from deciding the merits of the claim.

"[f]or other such relief the court deems just and proper," and for "[p]unitive damages." Because Hambrick seeks legal damages resulting from the HCP defendants' alleged fraud, we conclude the trial court abused its discretion by invoking the doctrine of judicial abstention with respect to the second cause of action.[29] (See *Shuts v. Covenant Holdco LLC*, *supra*, 208 Cal.App.4th at p. 625.)

### 2. Hambrick Failed To State a Cause of Action for Fraudulent Concealment

Our determination that the abstention doctrine does not apply to Hambrick's cause of action for fraudulent concealment does not end our inquiry on appeal. An appellate court will "'affirm the judgment if it is correct on any ground stated in the demurrer, regardless of the trial court's stated reasons. [Citation.]' [Citation.]" (*Law Offices of Mathew Higbee v. Expungement Assistance Services* (2013) 214 Cal.App.4th 544, 551.)

"In reviewing the sufficiency of a complaint against a demurrer, we 'treat[] the demurrer as admitting all material facts properly pleaded,' but we do not 'assume the truth of contentions, deductions or conclusions of law.' [Citation.] We liberally construe the pleading to achieve substantial justice between the parties, giving the complaint a reasonable interpretation and reading the allegations in context. [Citations.] When a demurrer is sustained, we must determine de novo whether the complaint alleges facts sufficient to state a cause of action under any legal theory. [Citation.]" (*Arce*, *supra*, 181 Cal.App.4th at pp. 481-482; accord, *Lin v. Coronado* (2014) 232 Cal.App.4th 696, 700-701; *In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1402.)

---

[29] At oral argument, counsel for the HCP defendants maintained that Hambrick did not seek legal damages in the second cause of action because her name was not specifically included in the prayer. As to the second cause of action, the prayer sought "[s]pecial and general damages according to proof for JANDRES and each member of the Class," "[f]or other such relief the court deems just and proper," and "[p]unitive damages." We consider the absence of Hambrick's name from the prayer to be an oversight, in that the second cause of action alleges that the HCP defendants' conduct "was a substantial factor in causing JANDRES, HAMBRICK and Plaintiffs' damages."

"The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact. [Citation.]" (*Graham v. Bank of America, N.A.*, *supra*, 226 Cal.App.4th at p. 606.)

In their demurrers, the HCP defendants argued that Hambrick failed to allege adequately the elements of duty to disclose, reliance and causation and, therefore, did not adequately plead a cause of action for common law fraud. We first turn to whether Hambrick adequately pleaded a duty to disclose.

According to Hambrick, HCP arranged for her medical and institutional care pursuant to contracts it had with the health care service plan to which Hambrick paid her periodic premiums, and therefore had a duty to disclose its relationship with the health care service plan to Hambrick. Specifically, Hambrick alleges that the HCP defendants "had illegally, directly or indirectly, assumed financial responsibility for Plaintiffs' hospital care and that such assumption of risk would affect the physicians, specialists, facilities and hospitals to which [the HCP defendants] would direct Plaintiffs" and that "[t]he information concerning [the HCP defendants'] financial assumption of hospital risk, and how such assumption restricted and delayed Plaintiff's access to care, was material information a reasonable patient would want to have in making a treatment decision."

These allegations do not establish a duty to disclose on the part of HCP. Hambrick cites no authority for the proposition that a risk-bearing organization that contracts with a health care service plan has a duty to disclose its financial arrangement with the plan to subscribers for whom it arranges medical and hospital services. Hambrick's reliance on informed consent cases involving an individual physician's duty to disclose to a patient information material to the decision whether to undergo treatment is misplaced. (See, e.g., *Arato v. Avedon* (1993) 5 Cal.4th 1172; *Moore v. Regents of*

41

*University of California* (1990) 51 Cal.3d 120.) Although in her first amended complaint Hambrick makes reference to a treating physician's duty to disclose to his or her "patients all material information a reasonable patient would want to know before consenting to treatment," HCP is not Hambrick's doctor, and this is not an informed consent case.

Because we conclude that Hambrick failed to allege the requisite duty to disclose we need not determine if she adequately pleaded the elements of reliance and causation.

3. The Trial Court Properly Denied Leave To Amend

Hambrick contends that to the extent a pleading defect exists, the trial court should have granted leave to amend. "When a demurrer is sustained without leave to amend, we must also decide whether there is a reasonable possibility that the defect can be cured by amendment. [Citation.] If the complaint can be cured, the trial court has abused its discretion in sustaining without leave to amend. [Citation.]" (*Arce*, *supra*, 181 Cal.App.4th at p. 482.) The plaintiff has the burden of demonstrating how the complaint can be amended to cure any defect. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081; *Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32, 36.) """The assertion of an abstract right to amend does not satisfy this burden."" [Citation.]" (*Graham v. Bank of America, N.A.*, *supra*, 226 Cal.App.4th at p. 619.) The required showing may be made in the trial court or the reviewing court. (*Annocki*, *supra*, at pp. 36-37.)

Because Hambrick has failed to make a showing that she can cure the defect in her second cause of action by amendment, we conclude that leave to amend was properly denied.

**F.** *The Trial Court Properly Awarded the HCP Defendants Costs*

"Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceedings." (Code Civ. Proc., § 1032, subd. (b); *Brown v. Desert Christian Center* (2011) 193 Cal.App.4th 733, 737-738.) A

prevailing party includes "a defendant in whose favor a dismissal is entered." (Code Civ. Proc., § 1032, subd. (a)(4).)

Hambrick challenges the trial court's award of $4,765 in costs to the HCP defendants. She argues that the HCP defendants were not "prevailing parties" because the trial court's dismissal of the action was a procedural ruling rather than a determination on the merits. Hambrick does not cite to any California authority, instead relying on the Ninth Circuit's decision in *Elwood v. Drescher* (9th Cir. 2006) 456 F.3d 943. In *Elwood*, the court held that the parties in whose favor the case was dismissed on the basis of abstention under the *Younger* doctrine[30] were not prevailing parties entitled to attorneys fees under section 1988 of Title 42 of the United States Code. (*Elwood*, *supra*, at p. 948.) *Elwood* involved interpretation of a federal statute not at issue here, and the decision is not binding on this court. (*Williams v. Superior Court* (2014) 230 Cal.App.4th 636, 657.)

As our colleagues in the Fifth District in *Brown v. Desert Christian Center*, *supra*, 193 Cal.App.4th 733 observed, "[n]othing in the wording of [Code of Civil Procedure section 1032] indicates that a defendant's right to recover costs is limited to certain *types* of dismissals . . . . Since the Legislature has not distinguished between types of dismissal in the statute, we will not read such a restriction into it." (*Id.* at p. 738.) In *Brown*, the court held that where the trial court dismissed the case on the basis of subject matter jurisdiction raised as an affirmative defense, the defendants were the prevailing parties. (*Id*. at p. 741.) We agree with the reasoning in the *Brown* decision, and conclude that the trial court properly awarded the HCP defendants costs pursuant to Code of Civil Procedure section 1032.

---

[30]     *Younger v. Harris* (1971) 401 U.S. 37 [91 S.Ct. 746, 27 L.Ed.2d 669].

## DISPOSITION

The judgment of dismissal, including the order awarding costs, is affirmed.  HCP, HCP-LLP and DVHCP are awarded their costs on appeal.


FEUER, J.*

We concur:


PERLUSS, P. J.


ZELON, J.

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| COREY HAMBRICK, | B251643 |
| Plaintiff and Appellant, | (Los Angeles County<br>Super. Ct. No. BC492767) |
| v. | |
| HEALTHCARE PARTNERS MEDICAL<br>GROUP, INC. et al., | ORDER CERTIFYING FOR<br>PUBLICATION |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above-entitled matter filed on June 1, 2015 was not certified for publication in the Official Reports. For good cause it now appears that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), and respondents' request pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____          _____          _____
PERLUSS, P. J.                   ZELON, J.                        FEUER, J. **(Assigned)**